GUSTAVE A. GILGREN, APPELLEE, V. BLANCHE PRICE, APPELLANT.
DAVID CHRISTIAN GILGREN, APPELLEE, V. BLANCHE PRICE, APPELLANT.

299 N. W. 325

FILED JULY 18, 1941. NOS. 31146, 31147.

*J. Howard Davis* and *Paul L. Martin,* for appellant.

*R. P. Kepler* and *Martin W. Dimery, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, MESSMORE and YEAGER, JJ.

YEAGER, J.

Presented here are two actions identical in all particulars except as to names of parties and description of real estate. They were consolidated for trial in the district court and have been presented here on one bill of exceptions and one set of briefs. They will be disposed of in one opinion. The actions were originally instituted in the district court for Cheyenne county, Nebraska, by plaintiffs and appellees, against Blanche Price, defendant and appellant, and others not parties to this appeal, the objects and purposes of which were to obtain specific performance of an alleged oral contract between plaintiffs and one August Burk, and to quiet title in Gustave A. Gilgren to the northwest quarter (NW ¼) of section twenty-eight (28), township seventeen (17) north, range forty-nine (49), west of the sixth P. M. in Cheyenne county, Nebraska; and to quiet title in David Christian Gilgren to the southwest quarter (SW¼) of this section of land.

The substance of the claims of plaintiffs, as set forth in their petitions, is that prior to her death on April 21, 1934, Anna Kristina Gilgren, mother of plaintiffs, was the owner of the northwest quarter (NW ¼) and the southwest quarter (SW ¼) of section twenty-eight (28), township seventeen (17) north, range forty-nine (49), Cheyenne county, Nebraska, and that at the time of her death Vera Josephine Andersen held a mortgage on the northwest quarter, and the Lincoln National Life Insurance Company held a mortgage on the southwest quarter. After the death of Anna Kristina Gilgren the mortgagees foreclosed the mortgages, and decrees of foreclosure were duly entered in March and September, 1935, respectively, and nine-month stays were taken in each case. Prior to the sales August Burk purchased and secured assignments of the judgments of the two mortgagees, whereupon the stays were withdrawn and sales made to August Burk, which sales were duly confirmed and deeds were issued.

August Burk was a brother of Anna Kristina Gilgren, an uncle of Gustave A. Gilgren and David Christian Gilgren,

and a brother of one Lottie Akeson. Lottie Akeson predeceased both Anna Kristina Gilgren and August Burk, and in her will bequeathed to each of them $1,000. After her death, and before receipt of the bequest, Anna Kristina Gilgren died, thus causing the bequest to become payable to the estate of Anna Kristina Gilgren. Gustave A. Gilgren and David Christian Gilgren, being the only heirs at law entitled to take, were entitled to share equally in the distribution of this bequest.

On October 27, 1939, August Burk died in Cass county, Nebraska, leaving a will in which he gave to Blanche Price, a niece, all of his estate after the payment of debts, funeral expenses and costs of administration. This will was duly probated in the county court of Cass county, Nebraska.

The plaintiffs contend that this will is in violation of an oral agreement which August Burk had with them, whereby Burk agreed to give Gustave A. Gilgren the northwest quarter, above described, and to give the southwest quarter to David Christian Gilgren.

They alleged that on May 16, 1936, and at many times prior thereto, August Burk orally promised that in consideration of the plaintiffs' withdrawal of their nine-month stays, and the transfer of the use and benefit of the real estate involved to August Burk, such use and benefit being rents and income during the life of Burk, and a further cash consideration of $1,000 to be received by plaintiffs out of the estate of Lottie Akeson through the estate of Anna Kristina Gilgren and paid over to August Burk to apply on the existing indebtedness upon the land in question here, at his death Gustave A. Gilgren would become the sole and absolute owner of the northwest quarter, and David Christian Gilgren would become the absolute owner of the southwest quarter. They say that the stays were withdrawn and that Burk received the $1,000 from the estate of Anna Kristina Gilgren.

It is this agreement that plaintiffs seek to have enforced in these actions, and they further seek to have titles quieted in them to the lands described as against the devise to Blanche Price.

On the question of the existence of the agreement, Gustave A. Gilgren, having been limited by the court to conversations relating to the David Christian Gilgren case, testified as follows: "Q. Did you ever have any conversation with him (August Burk) regarding what was to be done, or might be done, with the land that was given to your brother David by your mother? * * * A. Yes; we had conversations. Q. Will you just tell the court about when those conversations began, if you can recall? A. Yes, sir; those conversations began shortly after the will was probated, her will. Q. Do you know whether or not your uncle August Burk knew of the mortgage against that land? A. I do. Q. Now, just tell the court what he said to you about this quarter of land that was willed by your mother to your brother David? * * * Q. Subsequent to the death of your mother, as you have testified? A. Well, there were several conversations. I couldn't just exactly remember the whole thing. He said he would like to see the mortgage cleared up so we could get the benefit from the land, was mostly his idea. Q. Did you hear him make any proposition to your brother David regarding that matter of clearing up the mortgages on the land? * * * A. Yes. Q. What did he say? A. He said that if we can get the money and get together and try and clear it up. * * * Q. Did he make any suggestions to you as to how that could be done, or what he would do about it? Answer 'Yes,' or 'No.' A. Yes. Q. What did he say? A. He said he would try to get the money, and if he could clear it up and buy it out some way that he would see that we got some benefit out of it. * * * Q. Was there anything that your brother David was to do in connection with that? A. Yes, sir. Q. What was it? A. Well, he was supposed to take his share of the estate that was willed to my mother, and it was afterwards willed to him and I, and apply on the land. Q. What money or estate was that? A. That was the estate of my aunt Lottie Akeson. Q. Do you know where the money from that estate—where did the money from that Akeson estate go to, if you know, who was it paid to? A. According to my knowledge it was paid to my mother's

estate, and then it was paid to apply on those mortgages. * * * Q. Now, in return for what you have just testified to, to be done by your brother David in connection with this land and the proceeds of that estate, what, if anything, did Mr. Burk say he would do? * * * A. He said if they could get it cleared up and he could have the income from the land that he would will or deed us the land at his death. Q. Did you have any further conversation with him about the deeds, and if so what was it? A. Yes, sir; he said one time he would fix up two deeds and then at his death they were to be turned over to us. Q. Who do you mean by 'us'? A. My brother David and I."

Ellen Gilgren, wife of Gustave A. Gilgren, in relation to a conversation with August Burk testified to the following: "Q. What was your conversation with him? A. I told him I didn't want to sign that paper to give him control of the estate. Q. What did he say? A. He said if I would, he said at his death we would get it, he would either give us a quit-claim deed or turn it over to us in a will at his death. Q. Who did he say he meant, if he did at all, by 'we'? A. He meant my husband and I. Q. Did he tell you anything, or did you talk about the other piece of land that was willed to Dave? A. Yes, sir; he said that went to him and his wife."

David Christian Gilgren, having been limited by the court to conversations relating to the Gustave A. Gilgren case, testified as follows: "Q. Now, did you ever have any conversation with your uncle August Burk respecting the real estate that was owned by your mother at the time of her death? A. Yes; I did. Q. Did you have more than one conversation with him? A. Yes. Q. Over how long a period did those conversations take place? A. I would judge about three months. Q. And can you tell now how many you had during that three months period? A. Oh, I should say ten or twelve. * * * Q. Now, just tell the court what those conversations were between you and your uncle August Burk affecting the land that was in your mother's estate, that is, for instance the northwest quarter? * * * Q. I will ask you

another question, then what did he say to you regarding the northwest quarter of section 28-17-49 in those conversations you had with him? A. Well, it was mostly about this estate money from the Lottie Akeson estate. I said I didn't like to sign it over and he said, 'Well, if I give you the money you will just spend it, but if you have it in this place, why,' he said 'after my death you will have the place clear.' * * * Q. What was he going to do, what did he say, if anything, he would do? A. Well, he said he would put up the balance of the money so he could save the places for us. Q. And what was to be done then? A. Well, he was to receive all rent and all dividends off of it until after his death. Q. Then what was to happen to it? A. It was to be willed to my brother Gus. Q. Do you recall anything about his talking to you about withdrawing a stay against the foreclosure to that land? A. Yes, sir. * * * Q. Did you consent to that, or did you, do you know whether Gus consented to that withdrawal of the stay? A. Yes; I believe he did. Q. Did you consent to the withdrawal of the stay in connection with those same foreclosures? A. Yes. * * *ʻ Q. Why did you agree to withdraw that stay? A. I figured that if we didn't we would probably lose the place or lose our interest in the estate."

On behalf of the plaintiffs, A. J. Kinnersley gave the following testimony with reference to conversations with August Burk: "Q. I will ask you if you had any conversation or conversations with Mr. August Burk, during the, well, in the spring of 1936? A. I had a number of conversations with him during the time that there was these foreclosures on the Gilgren property, I don't remember the dates. Q. Was that prior to the time when he finally purchased the property? A. That was prior to, and I also talked with him about it afterwards. * * * Q. What, if anything, did you say to him at that time about that? * * * A. I told him he would have to purchase a judgment and get an assignment of it in order to clean it up. * * * Q. Did he tell you the reason he wanted that at that time? A. He did. Q. What was that? A. The reason was he wanted to save it

for the boys. * * * Q. What was the conversation between you and Mr. Burk at the time you five were in Mr. Foster's office, that is, Mr. Burk, Mr. Foster, Mr. Dave Gilgren, Mr. Gus Gilgren and yourself? A. Well, the thing they wanted to do was to save that property for the boys, that is what he wanted to do. Q. Mr. Kinnersley, I want you to just tell as near as you can, if you can, just what the conversation was— what did Mr. Burk say? A. He said 'If I had enough money I would buy those judgments up,' but he said he didn't have it at that time. That was fairly early after the foreclosure." Referring to incidents attendant upon the procurement of the assignments by Burk of the foreclosure judgments, the witness testified: "Q. Now, what transpired prior to the time you went down there in connection with that, in connection with this whole deal? A. Well, we went in Mr. Foster's office and discussed how we would save the property, and what it was for, and Mr. Burk said, told them that if they would put in that $1,000 that was willed to their mother that he would make up the balance. Q. What $1,000 was that? A. That was the $1,000 in the Akeson estate. * * * Q. Proceed. A. And if they permitted him to take the title in his own name and receive the revenues during his lifetime they could live in the properties, and that he would make a will as soon as the transaction was completed willing them, Gustave the northwest quarter and David the southwest quarter."

This quoted testimony is substantially all of the evidence in support of the contention that the plaintiffs entered into an oral agreement with August Burk, by the terms of which Burk agreed to give by deed or will the two quarter-sections of land to the plaintiffs, in consideration whereof they agreed to release two foreclosure stays, and to pay or cause to be paid to Burk a legacy of $1,000 which came to their mother from the estate of her sister and to them through the estate of their mother.

The evidence further showed the following: Burk took assignments of the two foreclosure judgments and paid for them a little more than $2,400, all his own money; that the

nine-month stays were withdrawn; that foreclosure sales were had and titles to the lands were confirmed in Burk; that after confirmations of sale and during the month of May, 1936, Burk made and executed a will in which it was provided that the plaintiffs were to each receive the quarter-section of land claimed by him in these actions; that thereafter, on January 17, 1938, Burk made a new will in which he gave all of his estate to Blanche Price, which will was, after his death which occurred on October 27, 1939, probated in the county court of Cass county, Nebraska; that in August, 1939, Gustave A. Gilgren attempted to negotiate with Burk for the purchase of the land now claimed by him, and in the same month David Christian Gilgren also attempted likewise to negotiate for the land that he claims; that Gustave A. Gilgren, while he occupied one quarter-section, paid no rent; that David Christian Gilgren occupied the other quarter-section but paid but a small amount of rent totaling approximately $200; that the taxes which were paid were paid by August Burk.

Further, it is shown conclusively by the evidence that Burk did not get the $1,000 which was a part of the consideration for the claimed agreement. All of the $1,000, except $224.81, was used in payment of the debts of the estate of Anna Kristina Gilgren, which amount was released to Burk. As against this amount the record shows by stipulation that Burk paid $423.35 in taxes upon these two quarter-sections of land, which became due before entry into the claimed oral agreement.

On this evidence the district court found that plaintiffs and August Burk had entered into the oral agreement pleaded in the petitions, and that there had been full performance on the part of the plaintiffs, and entered its decrees and judgments accordingly.

The substance of the assignments of error is that the court erroneously so found and decreed.

The rule is, in case an oral agreement to make a will is proved, that specific performance of the oral contract will be enforced, only, where one party has wholly and the other

party partly performed it, and its nonfulfillment on the one hand would amount to a fraud on the party who has fully performed. *Kofka v. Rosicky,* 41 Neb. 328, 59 N. W. 788; *Damkroeger v. James,* 95 Neb. 784, 146 N. W. 936; *Mercer v. Payne & Sons Co.,* 115 Neb. 420, 213 N. W. 813.

Assuming, but not deciding, that the oral agreement alleged by plaintiffs was proved, the evidence shows without doubt or contradiction that the part of the agreement which required the payment of $1,000 to August Burk was never performed. That this consideration was important can hardly be questioned, since the only others were the release of the foreclosure stays, and the use and benefit of the lands which Burk never got to any appreciable extent. One of the stays had but five days to run and the other about six months. The plaintiffs were never ousted from possession, and only one of them ever paid rent and he only a very small amount.

We conclude that performance of the alleged oral contract by the plaintiffs was not proved; in fact, the evidence of the plaintiffs specifically negatives performance by them. In the absence of such proof the plaintiffs were not entitled to any of the relief prayed.

In the light of this view, we find it unnecessary to discuss the question of whether or not an oral contract was, in point of fact or law, proved, or the further question of whether or not it was error to allow the attorney, A. J. Kinnersley, to testify to conversations had with August Burk, or any of the other questions raised by the appeal.

We find, for the reasons herein set forth, that the decrees and judgments in each of these cases should be, and they are,

REVERSED.