JOHN SOPCICH, APPELLANT, V. AGNES TANGEMAN,
EXECUTRIX OF THE ESTATE OF MARY SOPCICH,
ET AL., APPELLEES.

45 N. W. 2d 478

Filed January 5, 1951.  No. 32792.

*George M. Tunison* and *Thomas P. Leary,* for appellant.

*Rosewater, Mecham, Stoehr, Moore & Mecham,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff brought this suit in equity to obtain specific performance of an alleged oral contract entered

into by him with his mother, Mary Sopcich, in 1933, whereby, "in consideration that John Sopcich would to the best of his ability live with Mary Sopcich, make a home for her, assist in the care and maintenance of the premises, provide for the support of Mary Sopcich, and as well as he was able purchase and provide for the needs of Mary Sopcich, then she, Mary Sopcich, would execute a will providing that at her death all of her property, real and personal, would descend to the plaintiff John Sopcich in fee simple." Plaintiff also prayed for an accounting and damages for waste.

He alleged that, relying upon the promises made by his mother, he faithfully performed his obligations under the contract, but that his mother was persuaded by her daughter, defendant Agnes Tangeman, to violate her oral contract with plaintiff and execute a will naming the daughter as sole beneficiary of all her property without any provision for plaintiff, which facts were unknown to him until in May 1948.

With regard to plaintiff's contention that he lacked the knowledge aforesaid, competent evidence in the record discloses that he was informed in February 1946 that such a will would be made by the mother giving all of her property to the daughter, whereupon plaintiff said: " 'That was the way I figured it.' * * * That was what he expected." Also, in July 1946, plaintiff was informed that such a will had been made, whereupon he said: " 'That is what I expected.' * * * 'Agnes is doing a good job taking care of my mother; that is the way it should be,' " or "that was what he expected. 'Ag was doing a wonderful job taking care of her mother, no more than right.' "

Further, petition for probate of such will was filed on November 5, 1947, and after notice as required by law, it was on December 6, 1947, admitted to probate without objections, and, as nominated in the will, the daughter was on December 8, 1947, appointed executrix without objections. In that regard, plaintiff's conten-

tions that the executrix was guilty of concealment or bad faith during the probate proceedings is not sustained by the record.

The primary issues presented by plaintiff's petition were traversed by the answer of defendant Agnes Tangeman, both as executrix and personally, and by her husband, defendant Noah Tangeman. The other defendants, heirs at law of deceased, and their respective husbands and wives, either defaulted or filed like answers prepared and submitted to them by plaintiff's counsel, wherein they admitted the allegations of plaintiff's petition, and joined in the prayer thereof.

After a hearing upon the merits, the trial court entered its decree, finding and adjudging the issues generally in favor of defendants, Agnes Tangeman, executrix, Agnes Tangeman, and her husband, Noah Tangeman, quieting title to the property in her, and dismissing plaintiff's petition at plaintiff's cost, primarily upon the ground that plaintiff had failed to prove the contract alleged.

In that connection the reasons given therefor by the court, whether right or wrong, are unimportant because: "A judgment will not be reversed, merely because the court gave a wrong reason for the rendition thereof." Kelley v. Wehn, 63 Neb. 410, 88 N. W. 682. As stated in 49 C. J. S., Judgments, § 22, p. 51: "Although it has been said that every court should state on the record the legal grounds for its judgment, the reasons assigned by the court for the judgment rendered do not constitute a part of the judgment. Also if the judgment given is correct, it is immaterial whether the reasons adduced for giving such a judgment are correct." See, also, 33 C. J., Judgments, § 59, p. 1104. As held in Kanaly v. Bronson, 97 Neb. 322, 149 N. W. 781: "A proper judgment under the pleadings and the evidence will not be reversed on appeal, merely because the trial court did not give the right reason for the decision." See, also, Crawford Co. v. Hathaway, 60 Neb. 754, 84

N. W. 271; Bastian v. Weber, 150 Neb. 709, 35 N. W. 2d 791; 3 Am. Jur., Appeal and Error, § 1008, p. 563.

Plaintiff's motion for new trial was overruled, and he appealed. His assignments of error may be summarized as contending that the judgment was not sustained by the evidence but contrary thereto, and contrary to law. We conclude that the assignments have no merit.

At the outset we are met with defendants' contention that the district court had no jurisdiction of the subject matter in any event because the county court had exclusive jurisdiction of probate of the will, and that final orders made therein upon due and proper notice were binding upon all the parties and not subject to collateral attack, as attempted in this action. That contention has no merit.

In that regard, this court held in Best v. Gralapp, 69 Neb. 811, 96 N. W. 641, on rehearing at page 815, 99 N. W. 837: "A suit in the district court to enforce the specific performance of a parol agreement to devise real property and to quiet title in the plaintiff, as against those claiming under a will duly allowed and admitted to probate in the county court is not a collateral attack on the judgment admitting such will to probate." As held in In re Estate of Skade, 135 Neb. 712, 283 N. W. 851: "The making of a will which violates unperformed obligations of testator under a valid oral contract, after full performance by the other party, does not destroy the contract." See, also, Lacey v. Zeigler, 98 Neb. 380, 152 N. W. 792, wherein it was held: "And when such contract and relation are established under a single and indivisible contract, and the promisor dies without having complied with the terms of his promise, the county court is without, and the district court has, jurisdiction of an action for the specific performance of such contract."

It is well established that: "Actions in equity, on appeal to this court, are triable de novo in conformity

with section 25-1925, R. S. 1943, subject, however, to the condition that when the evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the oppoosite." O'Brien v. Fricke, 148 Neb. 369, 27 N. W. 2d 403. See, also, Kuenzli v. Kuenzli, 150 Neb. 855, 36 N. W. 2d 247.

As in the case at bar, Lunkwitz v. Guffey, 150 Neb. 247, 34 N. W. 2d 256, involved an alleged oral contract. Therein it was not only held that: "Each case is to be determined from the facts, circumstances, and conditions as presented therein," but also held that "Such contracts are on their face void as within the statute of frauds, because not in writing, and, even though proved by clear and satisfactory evidence, they are not enforceable unless there has been such performance as the law requires."

In Riley v. Riley, 150 Neb. 176, 33 N. W. 2d 525, it was held that: "One seeking specific performance of an oral contract to convey real estate has the burden of showing that he has performed the burdens imposed on him by the contract."

In Peters v. Wilks, 151 Neb. 861, 39 N. W. 2d 793, it was held: "Equity will grant specific performance of a parol agreement to leave property to another, if it is proved by evidence convincing and satisfactory, if it has been wholly performed by one party, and if its nonperformance would be a fraud on him."

In Gilgren v. Price, 140 Neb. 124, 299 N. W. 325, we held that: "Specific performance of an oral agreement to make a will will not be enforced where there has been a substantial failure of performance by the party seeking enforcement of the agreement." See, also, 58 C. J., Specific Performance, § 327, p. 1073, and § 330, p. 1075.

In 49 Am. Jur., Specific Performance, § 40, p. 54, it is

said: "The failure or inability or refusal to carry out the terms of the contract at the time when performance is due will ordinarily be grounds for refusing specific performance, since specific performance will not generally be decreed in favor of a party who has himself been in default, or who has wilfully violated his part of the contract, whereby the defendant has been deprived of a substantial benefit under it." Also, as stated in section 78, p. 95: "Courts of equity do not enforce specific performance of a contract where circumstances have arisen which makes its performance inequitable, or where there has been delay amounting to laches on the part of the plaintiff, and, as a general rule, will not grant a decree of specific performance in favor of a party who has himself once refused to perform the contract or who has been guilty of such conduct as amounts to a refusal to perform it. * * * A party cannot be permitted to violate his contract and wait until he sees that his bargain will be profitable, and then invoke the aid of a court of equity to have it executed."

Also, as held in Nelson v. Cross, 152 Neb. 197, 40 N. W. 2d 663, reaffirming numerous other cited cases: "An abandonment of a contract may be effected by acts of one of the parties thereto, which are inconsistent with its existence and acquiesced in by the other party." See, also, State ex rel. Spillman v. First State Bank, 119 Neb. 39, 226 N. W. 805. As stated in 58 C. J., Specific Performance, § 65, p. 909: "The right of a party to the specific performance of his contract may be lost by his abandonment thereof, by his acquiescence in the breach of the other party, by laches, or by conduct inconsistent with the right to relief, which amounts to a waiver or an estoppel."

Ultimate decision in the case at bar is dependent upon the application of such foregoing rules to the facts, circumstances, and conditions appearing in the record. As we view the situation presented, it may be ad-

mitted, for the purpose of argument only, that plaintiff established by competent evidence that the alleged oral contract was made with his mother, but nevertheless we are at once confronted with the question of whether or not plaintiff fully performed the obligations imposed thereby, or waived performance by the promisor, or abandoned the contract. We conclude that he did.

In that connection, the record discloses that plaintiff lived in his mother's home most of his life until he left in 1927 or 1928 because he had a fight with his stepfather. The stepfather died on February 9, 1933, and that day or the next, at most three or four days thereafter, plaintiff moved back into his mother's home. She was then in good health, owned the home here involved free and clear of encumbrances, and had cash on hand including insurance benefits and salary due deceased aggregating admittedly more than $1,000, and there is competent evidence that it was as much as $3,745. She also had the use of and some income from a garden, grape arbor, and chickens.

Whether or not the agreement, if existent, was made before or after plaintiff moved into his mother's home, is immaterial and not decisive here. It is true that from 1933 to 1943, plaintiff did live with his mother and, so far as he was able, substantially performed the agreement, although his questionable personal conduct by lack of sobriety on week ends and often during the week, was established without question. The details thereof need not be recited.

In 1940, he was ill at his mother's home for some time. During that period his mother, while caring for him, fell and was injured, necessitating hospitalization for several weeks, after which, under medical treatment over a period of months, she gradually recovered.

From 1933 to 1943, defendant Agnes Tangeman, her daughter who lived nearby, went to the mother's home two or three times a week and often every day, where she looked after the mother, and often when necessary

cleaned the house, did the washing, cooked the meals, and worked in the garden, as did her husband and their children.

In 1942 the mother's state of physical health had declined and become such that she was unable to care for herself without assistance. Seven or eight months prior to October 1943, both the mother and plaintiff began to persistently urge Agnes Tangeman and her husband to move into the home and care for the mother. They were also urged to do so by a Catholic priest who, knowing her physical condition, came into the home frequently to give the mother spiritual comfort.

At that time the Tangemans owned their own home nearby, free and clear of encumbrances. This they were persuaded to and did sell, and they moved in with the mother during 1943, whether in October or December is not entirely clear. Plaintiff claimed that the Tangemans were to be given rent free as consideration for taking care of the mother. This was denied by the Tangemans, but it is of little importance in the light of subsequent events.

When they moved in the roof was leaking, and the house was in need of repair. The property was then worth $4,500. Thereafter, plaintiff made no pretense of assuming any responsibility for his mother's care and support, or maintenance of the home, but for several weeks paid the Tangemans $10 a week for his board. From then until in November 1944 plaintiff lived in the home, during which period his personal conduct, caused by alcoholic intemperance, was intolerable at times. There is ample competent evidence that in November 1944, on election night, he celebrated the victory of his favorite candidate for President by becoming intoxicated. In that condition he went home late at night or early the next morning, bringing liquor with him. There he then created a scene, aroused and disturbed his ill mother and the entire family, vilified his brother-in-law who tried to get him to go to his room, and struck

at the brother-in-law, whereupon plaintiff's arm went through the two glass panels of a door and storm door, and he went down, kicking at his brother-in-law who struck plaintiff, giving him two black eyes and a bruised face. Plaintiff claimed that the brother-in-law told him to get out, grabbed him and started to beat him up, and that he, plaintiff, was not drunk although he admittedly had consumed a few bottles of beer and had brought four bottles home with him.

After the foregoing had happened, nothing was said to him that night about leaving, but he testified that later the sister said "something about she could not stand it any longer * * * She told me that she did not want me around." That statement was denied by the sister, and it was denied as well that anyone had ever told him to leave.

The next night the brother-in-law told plaintiff that he was sorry about what happened "last night" but told him to remember not to come home drunk and bother his mother and the children any more. He told him that he liked him and that he had a home there as long as he lived there. Then the brother-in-law told him to " 'Please brace up and come home like a man, and don't do like you did last night,' " whereupon plaintiff said " 'Okey.' " Thereafter plaintiff stayed in the home for ten days or two weeks, during which period nothing was said about him leaving, but he then moved out despite the fact that his mother, the daughter, the brother-in-law, and all the family tearfully begged him to stay. Thereafter he did have Thanksgiving and Christmas dinners with the family and came at times on Saturdays to visit with his mother. He testified that he moved because "I had trouble with my brother-in-law." He said he left "Because I thought it would be a good idea if they were talking about leaving, so after they beat me up and he was going to put me out of the house, which he tried, so, in order to keep peace in the family, and have some one home, why, I thought it would be the best

that I would move out in order to have them to keep peace at home."

From 1943 until the mother's death on October 27, 1947, the mother, almost a total invalid and confined first to a wheel chair or bed, and later entirely to her bed, was affectionately and efficiently cared for by Agnes Tangeman and her family. In the meantime until her death, the Tangemans provided for the mother, except for some items of clothing given the mother by plaintiff. They also paid the taxes, maintained the property, put a new roof and siding on the house, and improved it and other buildings in other material respects, at a cost of some $2,800. In December 1948, after this action was brought, the property was admittedly worth $7,000.

Admittedly the mother was mentally alert and entirely competent at all times until she suffered a stroke 24 to 48 hours before her death. On April 8, 1946, while so competent and without any evidence of undue influence, she executed a will in which, after direction for payment of all her just debts and funeral expenses, she gave, devised, and bequeathed all the rest, residue, and remainder of her property, real, personal, and mixed, to her daughter, Agnes Tangeman, to be hers absolutely, and nominated her as executrix. Therein she expressed great love and affection for her children and the children of her deceased children, naming all of them, including plaintiff, after which she said: "Because of the attention and care which my daughter Agnes Tangeman has given to me, it is my desire that she have absolute ownership of all of my property and for that reason, I have made no provision in my will for my other living children or for any of my grandchildren, the children of my deceased children."

In the light of the record before us and the law applicable thereto, we conclude that plaintiff failed to perform the obligations imposed upon him; voluntarily abandoned the contract; waived performance thereof by his conduct; and was not entitled to specific per-

formance. In that regard, cases relied upon by plaintiff are clearly distinguishable upon the facts. In such cases plaintiffs faithfully and fully performed their contractual obligations, or were ready, able, and willing at all times to so perform, but were prevented from doing so by action of defaulting promisors, who, without reason or excuse, repudiated or renunciated their contractual obligations.

For the reasons heretofore stated, the judgment of the trial court dismissing plaintiff's petition and quieting title to the property involved in defendant Agnes Tangeman should be and hereby is affirmed.

AFFIRMED.