A. R. SOFIO ET AL., APPELLEES, v. HENRY C. GLISSMANN, APPELLANT, IMPLEADED WITH HAROLD W. GLISSMANN, APPELLEE.

57 N. W. 2d 176

Filed February 27, 1953. No. 33233.

*Robert E. O'Connor* and *John F. Mackenzie,* for appellant.

*Paul J. Garrotto* and *James A. Nanfito,* for appellees Sofio.

*Tesar & Tesar,* for appellee Harold W. Glissmann.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, A. R. Sofio and Agnes H. Sofio, owned a legally described tract of land known as Parkwood Dairy in Omaha. They brought this action against defendants Henry C. Glissmann and Harold W. Glissmann to quiet their title to said land and recover $1,500 earnest money as liquidated damages because defendants had breached the provisions of a written purchase agreement entered into by the parties on or about November 20, 1950, which defendants had subsequently recorded. Defendants by separate answers each admitted execution and recording of the agreement and denied generally. Defendant Harold W. Glissmann alleged that after its execution he had assigned all of his right, title, and interest in the agreement to defendant Henry C. Glissmann, who in his answer admitted such assignment but alleged that plaintiffs had failed to perform the agreement because they were unable to give possession by virtue of a lease of part of the property to a tenant until March 1, 1952. He also alleged that on August 11, 1951, certain improvements on the property were destroyed by fire, for which plaintiffs had been reimbursed, and prayed the court to determine the amount thereof, allow him credit therefor on the purchase price, and decree that plaintiffs should convey the property to him upon payment of the balance. For reply plaintiffs denied

generally; alleged that defendants had no right, title, or interest in the agreement or property; and admitted the fire and reimbursement therefor, but alleged that the agreement had theretofore been canceled as of August 1, 1951, after numerous described extensions of closing dates and breach thereof by defendants who were unable to perform and at all times failed and refused to perform and pay the purchase price, not even offering to do so in their answer filed herein. Also, the record discloses that they did not even do so in open court.

After a hearing upon the merits, the trial court rendered a decree which found and adjudged the issues generally in favor of plaintiffs and against defendants, quieted title in plaintiffs, and ordered $1,500 earnest money paid by defendants to be retained by plaintiffs for liquidated damages as provided in the agreement, since plaintiffs had at all times fully complied with all the terms and conditions of the agreement but defendants had failed, neglected, and refused at all times to comply with the terms and conditions thereof. It also concluded that by virtue of the assignment aforesaid defendant Harold W. Glissmann had no right, title, or interest whatever in the agreement or real estate.

Defendant Henry C. Glissmann's motion for new trial was overruled and he appealed, assigning substantially that: (1) The decree quieting title and ordering $1,500 earnest money to be retained by plaintiffs as liquidated damages was not supported by the evidence; and (2) the trial court erred in refusing to grant specific performance relief as prayed by said defendant. We conclude that the assignments have no merit.

In Gatchell v. Henderson, *ante* p. 1, 54 N. W. 2d 227, this court said: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact

that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." In the light of such rule we have examined the record.

The contract involved was a "Uniform Purchase Agreement." It consisted of a written offer, a conditional receipt for the down payment made by defendants as earnest money, and an acceptance of defendants' offer by plaintiffs, all in one instrument, with each provision a necessary dependant part thereof. To hold otherwise it would be necessary to conclude that no agreement for purchase had ever been perfected, contrary to its express provisions and the affirmative positions of all the parties.

Insofar as important here, defendants agreed therein to purchase the property described upon condition that plaintiffs had "a good, valid and marketable title, in fee simple," and would "furnish abstract of title down to date of sale, and convey * * * by Warranty Deed." Defendants agreed, "to pay for same Twenty seven thousand five hundred ($27,500.00) Dollars, on the following terms, to-wit: $500.00, deposited herewith as evidenced by your receipt attached below, Balance to be paid at time of closing sale. It is further agreed and understood the present owner shall have until Febr. 1, 1951 to meet the conditions of rezoning. * * * This offer is subject to present owner having premises re-zoned to permit a trailer park and golf course operation." It also provided, "Present owner to have benefit of rent on farm land until March 1, 1951, which includes apartment on second floor of house. Rent on remainder of house, which is occupied by Wm. A. Mott, to be prorated as of closing date, who rents from month to month." Defendant Henry C. Glissmann concedes that the words "who rents from month to month" were written in at his request, although there is competent evidence in the record that he then had full knowledge that such tenant in possession had a lease until March 1, 1952, which plaintiff believed had been theretofore canceled by oral agreement. In

any event, defendants concededly knew all about such lease within 1 month after the purchase agreement had been signed and before the property had been rezoned or the abstract had been examined. In that connection, on January 29, 1951, before closing date and while the abstract was being examined, defendants negotiated an agreement in writing with such tenant canceling the lease but permitting him to remain in the property until 60 days from February 1, 1951. True, such agreement was never signed by the parties but concededly it was prepared by agreement between them, and thereafter defendants were given numerous extensions of time for closing, with full knowledge of all the facts with reference to the rights of tenants on the property. The tenant refused and could not be forced to vacate, so finally, in order to complete the transaction without controversy, it was agreed between plaintiffs, defendants, and the tenant that plaintiffs and defendants each would pay the tenant $200 and he would vacate the premises on July 1, 1951. In that connection, however, defendants did not pay their $200 share, and plaintiffs, solely to facilitate closing of the transaction, paid the tenant $400 to vacate, which he did on July 5, 1951. In the meantime, defendants had been given a purchase agreement extension to August 1, 1951, which nevertheless expired without performance by them. On or about July 10, 1951, plaintiffs notified defendants that unless they performed by August 1, 1951, the agreement would be canceled for breach thereof. They did not perform, so the agreement was thereby canceled.

Further, if that were not enough to show that defendants could not rely upon such lease to excuse performance, the same agreement itself also provided that: "Possession of said premises shall be given me subject to rights of tenants now in possession * * *.

"If this proposition is accepted, I agree to close said purchase in accordance therewith within ten days after delivery to me of abstract of title, and I further agree

to furnish a written opinion from my attorney showing defects, if any, in the title to the above property.

"This offer is based upon my personal inspection or investigation of the premises and not upon any representation or warranties of condition by the seller or his agent."

As stated in 55 Am. Jur., Vendor and Purchaser, § 154, p. 625: "Also, it has been held that where the vendee has knowledge of a lease of the premises which were in possession of the lessee, he is chargeable with notice of the conditions and options in the lease, and he cannot, because of these matters, refuse to take title. If the vendee enters into a contract with knowledge of a defect in the title, and he agrees not to object to the title upon this ground, he cannot rely upon this defect as an excuse for not performing the contract." Also, as stated in § 232, p. 690: "If the purchaser was made aware of, and purchased with full knowledge of, an outstanding leasehold, the leasehold does not render the title unmarketable. So, where a contract for the sale of land contains a provision for the adjustment of rents from the date of passing of title, the vendee cannot complain that the title is encumbered because of these outstanding tenancies." See, also, 57 A. L. R., Annotation, Marketable Title, p. 1403. In Pillsbury v. Alexander, 40 Neb. 242, 58 N. W. 859, this court held: "In an action brought by a vendor against a vendee to compel the latter to specifically perform his contract to purchase real estate, such vendee is estopped from alleging, as a defense to said action, a defect in his vendor's title; which defect was brought to the actual knowledge of the vendee at the time he entered into such contract of purchase, and where the evidence shows that he contracted to purchase such real estate incumbered with the alleged defect." In the light of the record and such rules we conclude that the lease to William A. Mott was no excuse for defendant's failure to perform the agreement.

As provided in the agreement, the parties understood

that it should "in no manner be construed to convey the premises, to create a lien thereon or to give any right to take possession thereof" and that "Upon acceptance of this offer present insurance on the premises shall be deemed for the benefit of the buyer and the seller, as their respective interests may appear." The receipt portion of the agreement provided: "Received from Henry C. Glissmann the sum of Five hundred ($500.00) Dollars, to apply on the purchase price of the above described property on terms and conditions as stated above, it being hereby agreed and understood that in the event the above offer is not accepted by the owner or vendor of said premises within the time hereinafter specified, or that in the event there are any legal defects in the title which cannot be cured after purchaser has filed or caused to be filed with us written notice of such legal defects, the money hereby paid is to be refunded. In the event of the refusal or failure of the purchaser to consummate the purchase, the owner or vendor may, at his option, retain the said money hereby paid, as liquidated damages for such failure to carry out said agreement of sale.

"This receipt is not an acceptance of the above offer, it being understood that the above proposition is taken subject to the written approval and acceptance of the owner on or before November 25, 1950."

Plaintiffs timely executed the acceptance portion of the agreement, which provided as follows: "We hereby accept the above proposition on the terms above stated and agree to deliver and convey said premises and perform all the terms and conditions above set forth. Providing 1000. more pd. as earnest money." Defendants thereupon promptly accepted the provision for the payment of $1,000 more as earnest money and deposited said additional sum with the agent, which made up the total of $1,500 retained under the conditions provided in the receipt portion of the agreement.

In seeking a return of the $1,500 earnest money in-

stead of awarding it to plaintiffs as liquidated damages, defendants in effect take the position that there were three separate contracts, with defendants bound by only one of them. We cannot agree. Clearly there was but one complete and coordinated agreement. The fact that defendants' signatures did not appear at the end of the agreement is of little importance under the provisions contained therein. Brown v. State Automobile Ins. Assn., 216 Minn. 329, 12 N. W. 2d 712, relied upon by defendants cites numerous cases and so concludes, saying: "The place of a signature on a writing is not controlling. While ordinarily a signature is placed at the end of an instrument, it may, unless by statute a signature is required to be subscribed, be placed anywhere on the instrument, as, for example, at the top, to one side, in the body, or elsewhere. * * * The rule, as the cited cases show, is one of general application and applies to such instruments as contracts, promissory notes, bills of sale, deeds, leases, wills, and the like. * * * Where the signature is at the end of the instrument, it is generally plain that it authenticates everything above it. Where, however, written or printed matter appears below the signature, or on the back of the instrument, or on separate sheets of paper, a signature authenticates only the matter intended by the parties to be included as a part of the instrument. The intention must be manifested either by express reference or by internal evidence in the writings involved from which an inference of such intention follows. It has been so held in numerous cases involving the sufficiency of contracts and memoranda under the statute of frauds." See, also, Dollarhide v. James, 107 Neb. 624, 186 N. W. 989; Myers v. Moore, 78 Neb. 448, 110 N. W. 989. The evidence herein and the very instrument itself conclusively establishes that defendants accepted all matters above and below their signatures. They clearly intended that all written, typed, and printed matter both above

and below their signatures was and should be simply one entire contract.

In December 1950, the parties concerned met in the Council Chamber of the City Hall in Omaha for hearing upon plaintiffs' application to rezone the property. There were objections and plaintiffs were required to employ counsel, incurring an expense of $500. It will be noted that February 1, 1951, was concededly closing date, and before that date the property had been rezoned. The abstract had been extended and forwarded to defendants, and it had been examined without any contention or notice that it showed any defects. A check appearing in the record as an exhibit shows that defendants paid their attorney on February 1, 1951, for making such examination.

On that date, however, with full knowledge of all facts with relation to tenancy and otherwise, defendants requested and were granted an extension from February 1 to February 3, 1951, on which date it was again so extended to February 10, 1951, because defendants could not perfect a loan with which to close the transaction. Again on that date it was likewise extended to February 23, 1951, at which time defendants did not offer to close the transaction, but again on February 25, 1951, they requested a further extension, expressing for the first time in effect that the lease of William A. Mott prevented plaintiffs from giving possession and performing in any event. Be that as it may, on February 25, 1951, defendants requested and were granted another extension to March 1, 1951. However, from that date until March 9, 1951, defendants took no step to complete the transaction, and they were informed that by reason thereof they were in default and the earnest money would be retained as liquidated damages. Defendants then claimed by registered letter the right to not consummate the transaction before March 1, 1952, because of the William A. Mott lease, and claimed in fact that they then owned the property, whereupon they filed the

agreement of record on March 12, 1951, after defendant Henry C. Glissmann had himself, without any authority written on the bottom of it: "W. A. Mott has a lease that Expires Mar 1 - 1952." Despite such attitude, however, defendants requested and were again granted an extension to April 1, 1951, but were unable to raise the money. They then offered to pay $28,500 on or before May 15, 1951, if an extension was granted until that date and release all claims to the $1,500 paid as earnest money if such purchase price was not then forthcoming. However, on May 1, 1951, defendants' counsel requested in writing an extension to July 1, 1951, proposing that on failure then to perform defendants would forfeit their $1,500 earnest money. In such letter also defendants stated that the rights of tenants would be respected.

Plaintiffs then agreed to such proposal but in the meantime defendants changed their minds, and on May 11, 1951, made a new proposal to pay $28,500 if consummation were extended to August 1, 1951, and to forfeit the $1,500 if not then consummated. Plaintiffs then accepted that offer and their counsel reduced it to writing, but defendants refused to sign the same as agreed. On June 12, 1951, defendants were again given until June 19, 1951, to complete the transaction, or plaintiffs would declare the agreement to purchase canceled and the earnest money forfeited as of that date. Thereafter, on June 18, 1951, defendants by letter requested a personal conference with plaintiffs' counsel, who replied by letter requesting that defendants sign the proposal to extend to August 1, 1951, and such extension would be made. However, such letter was never answered by defendants and their then counsel withdrew his representation of them. As late as July 10, 1951, plaintiffs' agent called upon defendant Henry C. Glissmann to inquire why the transaction had not been completed and he was informed by said defendant that he did not have the money and could not arrange for a loan, but he proposed that permission be given him by plain-

tiffs to sell the property and pay the purchase price from the proceeds. Unable to obtain performance, plaintiffs then elected to cancel the contract as of August 1, 1951, and retain the $1,500 as liquidated damages. They so notified defendants. However, no more was heard from them until August 15, 1951, when other counsel representing defendants sent a letter demanding that proceeds of the fire insurance policy, concededly $10,000, should be deducted from the purchase price, and then defendants would be ready to complete the transaction. The record conclusively establishes that defendants never tendered or offered to pay any of the purchase price or that they were every ready, willing, and able to do so, although they wrongfully assumed even to take possession of the property and have the right to sell part of the equipment on the premises, and even advertised the premises for sale without having any right or title thereto.

The record discloses that plaintiffs performed all conditions precedent and were able and willing at all times prior to August 1, 1951, to convey the property to defendants, but that defendants failed, neglected, and refused to perform. It also discloses that the agreement was canceled by plaintiffs as of that date for failure of defendants to perform. The general rule is as argued by defendants that where performance of a contract is delayed through the fault of the vendor, he is liable for the deterioration or destruction of the property and in such a situation the loss by fire would be that of the vendor. However, the rule has no application under the facts heretofore set forth in this case.

In O'Brien v. Fricke, 148 Neb. 369, 27 N. W. 2d 403, this court said, citing numerous cases: "The specific performance of a contract by a court of equity is not generally demandable or awarded as a matter of absolute legal right but is directed to and governed by the sound legal discretion of the court, dependent upon the facts and circumstances of each particular case. It will

not be granted where enforcement would be unjust, and may be denied where the party seeking it has failed to perform." We also said in that opinion: "He is bound by the rule that a party who comes into equity, seeking specific performance, must show not only that he has a valid legally enforceable contract, but also that he has substantially complied with its terms by performing or offering to perform on his part the acts which formed the consideration of the undertaking on the part of defendant, or that he is ready, able, and willing to perform his obligations under the contract and do whatever has been made a condition precedent on his part or show a valid excuse for non-performance of the covenants incumbent upon him. 49 Am. Jur., Specific Performance, § 40, p. 53. As appropriately stated in the latter citation: 'A proposed purchaser is not able to perform when he is depending upon third persons for the funds to make the purchase, which funds such persons are in no way bound to furnish.'" See, also, Johnson v. Norton, 152 Neb. 714, 42 N. W. 2d 622, and Sopcich v. Tangeman, 153 Neb. 506, 45 N. W. 2d 478, wherein this court said: "In 49 Am. Jur., Specific Performance, § 40, p. 54, it is said: 'The failure or inability or refusal to carry out the terms of the contract at the time when performance is due will ordinarily be grounds for refusing specific performance, since specific performance will not generally be decreed in favor of a party who has himself been in default, or who has wilfully violated his part of the contract, whereby the defendant has been deprived of a substantial benefit under it.' Also, as stated in section 78, p. 95: 'Courts of equity do not enforce specific performance of a contract where circumstances have arisen which makes its performance inequitable, or where there has been delay amounting to laches on the part of the plaintiff, and, as a general rule, will not grant a decree of specific performance in favor of a party who has himself once refused to perform the contract or who has been guilty of such con-

duct as amounts to a refusal to perform it. * * * A party cannot be permitted to violate his contract and wait until he sees that his bargain will be profitable, and then invoke the aid of a court of equity to have it executed.' * * * As stated in 58 C. J., Specific Performance, § 65, p. 909: 'The right of a party to the specific performance of his contract may be lost by his abandonment thereof, by his acquiescence in the breach of the other party, by laches, or by conduct inconsistent with the right to relief, which amounts to a waiver or an estoppel.' " Such rules are applicable and controlling here. We therefore conclude that defendants were not entitled to specific performance.

It is generally the rule that where a plaintiff, who has himself been ready, willing, and able to perform has repeatedly requested a defendant to perform a recorded contract for the purchase of real property by defendant, and such defendant has failed to tender or pay the purchase price or otherwise perform according to the terms of his agreement, then defendant is not entitled to specific performance but plaintiff is entitled to have title quieted in him. Wiiest v. Pounds, 142 Neb. 882, 8 N. W. 2d 211; Kear v. Hausmann, 152 Neb. 512, 41 N. W. 2d 850; Johnson v. Norton, *supra*. See, also, § 25-21,112, R. R. S. 1943. We conclude that the decree quieting title in plaintiffs was proper in every respect.

We turn then to the question of liquidated damages and the propriety of the allowance thereof to plaintiffs. In that connection we call attention to the fact that the agreement specifically provided that upon the failure or refusal of the purchaser to consummate the purchase according to the terms thereof, the vendor could retain the earnest money paid as liquidated damages for such failure. The money so paid in this case was $1,500, and not $500 as claimed by defendants. Their own evidence belies the contention. They always realized and conceded that they stood to lose $1,500 for failure of performance by them.

In Wilderman v. Watters, 149 Neb. 102, 30 N. W. 2d 301, this court held: "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties, and to give effect to such intention if it can be done consistently with legal principles.

"It is well established, in the interpretation of a writing which is intended to state the entire agreement, preliminary negotiations between the parties may be considered in order to determine their meaning and intention, but not to vary or contradict the plain terms of the instrument." See, also, 12 Am. Jur., Contracts, § 234, p. 757.

In Stanford Motor Co. v. Westman, 151 Neb. 850, 39 N. W. 2d 841, this court held: "If the damages arising from a breach of the contract are difficult of ascertainment or admeasurement, and if the stipulated amount is not disproportionate to the amount of damages that may be reasonably anticipated from the breach, it will usually be regarded as a provision for liquidated damages.

"As a general rule, the question of whether a sum mentioned in a contract is to be considered as liquidated damages or as a penalty is a question of law, dependent on the construction of the contract by the court." See, also, Edgar v. Anthes, 109 Neb. 546, 191 N. W. 682; Gustin & Co. v. Nebraska Building & Investment Co., 110 Neb. 241, 193 N. W. 269; Restatement, Contracts, § 339, Comment (1) c, p. 553. By analogy, such rules have application here, and we conclude that the trial court's order permitting plaintiffs to retain the $1,500 earnest money as liquidated damages was correct. As a matter of fact, the record discloses that plaintiffs actually suffered more than $1,500 as damages by reason of defendants' failure to perform their part of the agreement.

For the reasons heretofore stated, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.