**GIBBS, NATHANIEL (CANADA) LTD., Appellee,**

v.

**INTERNATIONAL MULTIFOODS CORPORATION, Appellant.**

**No. 85–5321.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1986.

Decided Oct. 29, 1986.

Stacey A. DeKalb, Minneapolis, Minn., for appellant.

Thomas Fraser, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and ROSS and WOLLMAN, Circuit Judges.

WOLLMAN, Circuit Judge.

International Multifoods Corporation on appeal from a judgment against it in a diversity action for breach of contract challenges the magistrate's application of the law of anticipatory repudiation and raises issues regarding the calculation of damages and the award of prejudgment interest. We reverse.

International Multifoods Corporation through its Adams Foods division (Adams) on January 2, 1981, entered into a contract to purchase 500 metric tons (plus or minus five percent) of peanuts from Gibbs, Nathaniel (Canada) Ltd., (Gibbs) of Toronto, Canada. The contract called for the ship-

ment of 250 tons in February/March 1981 and 250 tons in March/April 1981, with no delivery date specified. Gibbs was to guarantee that the peanuts would pass inspection by the U.S. Food and Drug Administration (FDA) and was to have "the option of Blanching/Reconditioning/Replacing any quantity which fail[ed] initial entry but [was] not bound to do so." Adams was responsible for the import duties and license and for the contract price of $1.10 per pound "C.I.F.," that is, including insurance and freight as well as the cost of the peanuts. Payment was due upon "passing/release of each delivery by U.S. Government authorities."

By June 1, 1981, 854,921 pounds of peanuts [1] had passed government inspection and been released to Adams. An additional 330,690 pounds, however, had been detained by the FDA because of insect infestation. By letter dated June 3, 1981, Adams informed Gibbs that it was "rejecting" the infested shipment of peanuts and "canceling" that portion of the contract. Gibbs responded that it was "unable to accept" the cancellation and that it was exercising its right under the contract to recondition the peanuts to meet FDA standards. Adams, however, by letter dated June 17, 1981, stated that anything Gibbs did with the rejected peanuts was "at [Gibbs'] own risk and benefit."

On July 18 and again on July 20, 1981, representatives of Gibbs and Adams engaged in telephone discussions that resulted in Adams' agreeing to accept (and in fact accepting) 66,965 pounds of substitute peanuts. Adams also agreed to accept the balance of the contract poundage (including the five-percent margin) from the reconditioned peanuts if those peanuts passed FDA inspection upon the completion of the cleaning process around July 25. The reconditioned peanuts, however, still did not pass, and by letter dated August 21, 1981, Adams informed Gibbs that it was again refusing to accept that shipment. Adams

further stated in this letter that it wished to remind Gibbs that "on June 3rd we cancelled our contract with you on this said quantity of peanuts and therefore you had no further obligation to tender peanuts to us and we had no obligation to accept further shipment." Adams stated that it had accepted the substitute shipment of 66,965 pounds only "in good faith in order to help alleviate the problems."

In the fall of 1981 Gibbs submitted the peanuts to a different reconditioning process known as "split blanching," and on October 16, 1981, the peanuts passed FDA inspection. Gibbs then tendered the peanuts to Adams, but Adams rejected the tender as untimely and stated that its position remained as expressed in the August 21 letter and in "our cancellation letter of June 3." Gibbs subsequently resold the peanuts for $.30 per pound and brought suit against Adams alleging breach of contract.

The magistrate concluded that Adams' conduct in canceling the contract without giving Gibbs a chance to recondition the infested peanuts constituted a wrongful anticipatory repudiation. On Adams' motion to alter or amend the judgment, or, in the alternative, for a new trial, the magistrate concluded that Adams, despite its willingness to accept the peanuts in July if they passed inspection, had not withdrawn its repudiation of the contract because it had consistently refused to recognize a contractual obligation to accept any peanuts after June 3.

We conclude that the record reveals clear error in the magistrate's finding that Adams did not retract any alleged anticipatory repudiation before the time for Gibbs' performance under the contract. The undisputed facts show that at least by July 18, 1981, both parties understood that if Gibbs would tender the reconditioned peanuts under the contract in a timely fashion, Adams would accept them. This fact is made clear by the letter from N.D. Mar-

---

1. A metric ton equals 2,204.6 pounds. Thus, the contract was for 1,102,300 pounds of peanuts, and with the five-percent margin, Adams was obligated to accept up to 1,157,415 pounds of peanuts.

shall of Gibbs to Dennis Farrell, general manager of Adams, dated July 21, 1981, confirming the telephone conversations of July 18 and 20. The substance of Marshall's letter is not disputed by the parties: at least through July of 1981, Adams would have accepted conforming peanuts. Later statements by Adams to the effect that it considered the contract "cancelled" as of June 3, 1981, are not relevant to the issue of what interim understanding the parties had regarding Gibbs' right and ability to recondition and retender the peanuts.[2] The fact remains that subsequent to June 3 both parties agreed that Gibbs could exercise the contracted option to recondition the peanuts. Although Gibbs attempted to recondition and deliver the peanuts to Adams, Adams properly rejected them as nonconforming. Therefore, Gibbs' own conduct confirms the July 18 agreement. For Gibbs now to ignore these events and attempt to rely solely upon the June 3 repudiation is totally irreconcilable.

Given this factual setting, Adams should not be found liable for breach of contract. The July 18 interim agreement can be considered as a retraction of any repudiation Adams may have made. Retraction of anticipatory repudiation is allowed under Minn.Stat. § 336.2–611 (1984). The requirements for a valid retraction are that the repudiating party, before its "next performance is due," see id. § 336.2–611(1), must retract "by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform," id. § 336.2–611(2). This retraction must be made before the "aggrieved party has since the repudiation cancelled or materially changed [its] position or otherwise indicated that [it] considers the repudiation final." Id. § 336.2–611(1). Adams' actions

and Gibbs' reactions to them clearly fall within this standard. Adams' performance was not "due" until the peanuts were properly tendered. Before the peanuts were retendered, Adams and Gibbs understood that a timely retender would be accepted. Gibbs' continued attempts to comply with the contract terms show that it did not consider any "repudiation" to be "final."

The parties' conduct after June 3, 1981, also demonstrates that they agreed to follow the terms of the original contract and maintained Gibbs' option to retender the peanuts. The magistrate found that a commercially reasonable time for delivery of the peanuts was July 25, 1981. Gibbs' first attempt to retender conforming peanuts failed, and it did not tender conforming peanuts at any time before October of 1981. Gibbs' belated choice of another reconditioning process and eventual tender of split blanched peanuts, which were not the peanuts for which the parties originally contracted, does not satisfy Gibbs' obligations under the accord reached between the parties. It was Gibbs and not Adams that breached the contract.

Nothing in the record shows that Gibbs ever could have performed under the original contract. The peanuts were so grossly infested that one cleaning process left insect filth in the goods. The necessary split blanching altered the peanuts, both in quality and quantity.[3] Gibbs' uncertain ability to perform is important in determining whether Adams is liable for anticipatory breach at all. To collect damages for an anticipatory breach, a party must show that it was capable of performance notwithstanding the anticipatory breach. Restatement (Second) of Contracts § 254(1) (1979). This common law notion applies in actions under the Uniform Commercial Code. See

**2.** Adams' subsequent references to the June 3 cancellation must be weighed in light of the fact that Gibbs on two prior occasions failed to deliver noninfested peanuts.

**3.** Gibbs' own N.D. Marshall testified that "blanched peanuts are not raw peanuts and to that extent they are not the same peanuts." See record at 123. Split blanching can cause flavor loss, id. at 141 (testimony of Mr. Marshall), and

reduces shelf life, id. at 219 (testimony of Mr. Farrell).

We acknowledge that Marshall's letter of July 21, 1981, states in part that "possibly one or more lots may be Split Blanched at no additional cost to you. This you agreed to accept as well." Nonetheless, Gibbs failed to deliver the peanuts, split blanched or not, by the July 25, 1981, performance date.

*Decor by Nikkei Int'l, Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 908 (S.D.N.Y.1980), *aff'd sub nom. Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The rationale is that if the nonbreaching party could not have performed, no repudiation would "substantially impair the value of the contract" under Minn.Stat. § 336.2–610 (1984). A party, like Gibbs, that was unable to perform, had no valuable contract to impair.

The ultimate analysis is that Gibbs' argument rings hollow when it claims that without Adams' June 3 repudiation it would have properly reconditioned the infested peanuts. It is in the nature of human events and commercial affairs for a seller to do what it can to ready its nonconforming product for sale. It is hypocritical for Gibbs to have used a reconditioning method that left the peanuts substandard, then claim in court that another party—Adams—should bear the loss caused by this failure. It was Gibbs that neglected its one contractual and statutory right to recondition the peanuts. Adams should not be forced to pay damages for this error.

Our holding that Adams is not liable for damages renders unnecessary any discussion of the other issues raised by the appeal.

The judgment is reversed, and the case is remanded with directions to enter judgment dismissing Gibbs' complaint.