ACME INVESTMENT, INC., a Nebraska corporation, Plaintiff,

v.

SOUTHWEST TRACOR, INC., a Texas corporation, Defendant.

SOUTHWEST TRACOR, INC., a Texas corporation, Plaintiff,

v.

ACME INVESTMENT, INC., a Nebraska corporation, Defendant.

Nos. 4:CV94–3365, 4:CV95–3079.

United States District Court, D. Nebraska.

Dec. 29, 1995.

David A. Domina, Domina & Copple P.C., Omaha, Nebraska, for Acme Investments, Inc.

Robert C. Williamson, Jr., Williamson & Associates, Jackson, Mississippi, for Southwest Tracor, Inc.

## MEMORANDUM AND ORDER

KOPF, District Judge.

These consolidated cases present three contract questions:

Question 1. What did the parties mean when their capable lawyers wrote that an option to repurchase real estate must be exercised by written notice *"within* 30 days *before* the expiration of the one-year option term"? (Ex. 2 ¶ 8 (emphasis added).)

Question 2. At the time the option was purportedly exercised, was the party exercising it required to pay the purchase price?

Question 3. At the time the option was purportedly exercised and thereafter until closing, was the party exercising it required to possess the present ability to pay the purchase price?

In response to these three questions, Southwest Tracor, Inc. (Southwest), the party who sought to exercise an option on real estate, advances the following arguments:

Argument 1: The written notice of the exercise of the option was properly given during the last 30 days of the one-year time frame.

Argument 2: Southwest was not required to pay the purchase price at the time the option was exercised.

Argument 3: Either (i) Southwest had the ability to pay the purchase price from the time the option was exercised until closing, or (ii) Southwest was prevented, and therefore excused, from having the ability to pay the purchase price by the breach or repudiation of the other party.

As might be expected, Acme Investment, Inc. (Acme) takes the opposite position with regard to each of these arguments.

I ultimately find and conclude that:

Finding and Conclusion 1: The written notice of exercise of the option was properly given during the last 30 days of the one-year time frame as claimed by Southwest.

Finding and Conclusion 2: Southwest was not required to pay the purchase price at the time the option was exercised.

Finding and Conclusion 3: Southwest (i) was required to have, but never did, the ability to pay the purchase price from the time the option was exercised until closing, and (ii) Southwest was not prevented, and therefore not excused, from having the ability to pay the purchase price by the conduct of Acme.

As a consequence, the attempted exercise of the option was ineffective, and judgment must be entered for Acme and against Southwest.

Pursuant to Federal Rule of Civil Procedure 52, I shall now set forth the findings of fact and conclusions of law that have informed my decision.[1]

## I. Facts

### Background

1. Acme is a Nebraska corporation. (No. 4:CV94–3365, Filing 23 Pretrial Conference Order ¶ D1.) Its president and chief executive officer is Gil Grady (Grady). (*Id.*)

2. Southwest is a Texas corporation. (*Id.* ¶ D2.) Its officers have been Francis B. "Chris" Freeman and his son Jeffrey C. Freeman. (*Id.*) Mark Lowrey was employed by Southwest in August, 1993. (*Id.*)

3. Airport Inn, Inc. (Airport Inn) is a corporation, and its chief executive officer is Grady. (*Id.* ¶ D3.) Airport Inn rented property known as the Best Western Airport Inn, a motel located near the airport in Lincoln, Nebraska. (*Id.*) Airport Inn did not own the real estate. (*Id.*)

4. Prior to late summer and early fall of 1993, Airport Inn leased the Best Western Airport Inn from Southwest. (*Id.* ¶¶ 4–6.) Certain disputes arose regarding this lease. (*Id.*)

5. On August 20, 1993, Acme, Airport Inn, Southwest, and others entered into a settlement agreement. (*Id.*) At the same time, the hotel owned by Southwest was sold to Acme and the parties entered into a purchase agreement to effectuate this sale. (*Id.*) Southwest sold Acme the hotel for $2,650,-000. (Ex. 2 ¶ 2.) The purchase agreement also assigned the lessor's interest in the lease between Airport Inn and Southwest to Acme. (No. 4:CV94–3365, Filing 23 Pretrial Conference Order ¶¶ 4–6.) The purchase agree-

---

**1.** Any finding of fact more properly construed as a conclusion of law shall be so construed. Like-wise, any conclusion of law more properly construed as a finding of fact shall be so construed.

ment was later amended in September, 1993. (*Id.*)

## Option Language

6. Acme granted Southwest an option to repurchase the motel for $2,450,000. (Ex. 2 ¶ 8.) The following pertinent language was used by the parties to express this option in the August 20, 1993, purchase agreement:

> [Acme] hereby grants to [Southwest] for a period of one year after Closing Date, an option to repurchase the Property from [Acme]. Any such repurchase shall be for a price of $2,450,000.00 cash at closing. The option must be exercised by written notice from [Southwest] to [Acme] within 30 days before the expiration of the one-year option term. [Southwest's] repurchase pursuant to this option may not be consummated or closed sooner than twelve (12) months after the closing of the original sale occurs. In the event [Southwest] exercises the option, the purchase price must be paid or tendered, and [Southwest] must be ready, willing and able to close within fifteen (15) months of the closing of the original sale, and [Acme] is obligated to convey good and marketable title to the Property to [Southwest] except for the exceptions set forth on Exhibit "C" within said 15 months, at a closing to be arranged by the parties.

(*Id.*)

7. This language was later partially amended. (Ex. 3.) This amendment, dated September 1, 1993, reads in pertinent part as follows:

> Amend paragraph 8 "Option to Repurchase" to provide as amended, that if [Southwest] exercises its option to repurchase the Property from [Acme], notwithstanding any other provision contained in paragraph 8 of the Purchase Agreement, that the sale may not be consummated or closed sooner than November 1, 1994. In the event [Southwest] exercises its right to repurchase the property, it must, at the time of exercising said right, also specify a "target" date for closing and payment of the purchase price which may be any date between November 1, 1994 and January 31, 1995. [Southwest] may extend the "target" date provided that in no event

> shall said extension extend beyond January 31, 1995. Except as herein provided, all other terms and conditions of the Purchase Agreement previously executed by the parties shall continue to remain in full force and effect.

(*Id.*)

## Negotiations Regarding Paragraph 8

8. Although the principals of Southwest and Acme were present in the building (or available by phone), the negotiations respecting the language of paragraph 8 of the August 20, 1993, purchase agreement were conducted primarily by counsel for Southwest, T. Randall Wright (Wright), and counsel for Acme, William G. Dittrick (Dittrick), outside the physical presence of the principals. (*Compare* Wright Trial Test. *with* Dittrick Trial Test.) These negotiations involved a bitter dispute and took place in a tense and hurried fashion on August 16, 1993, after a deposition was recessed. (*Id.*)

9. I observed both Wright and Dittrick when they testified at trial. Both men are extremely capable lawyers, and both were extremely credible witnesses.

10. As to when the option could be exercised, the language establishing the timing went through an unknown number of changes before finally finding its way into the agreement.

11. One of the earliest drafts stated that "[t]he option must be exercised by written notice from [Southwest] to Acme *within* 30 days *of* the expiration of the year option term." (Ex. 22A ¶ 4 (typed portion) (emphasis added).) It is likely that this language was first drafted by Dittrick, Acme's lawyer, after a conference with Wright. (Vol. III Tr. 374:11–13; 406:18–23.)

12. This language was altered by striking "within" and "of" and inserting "no later than," "prior to," and "one" so that the sentence was worded this way: "The option must be exercised by written notice from [Southwest] to Acme *no later than* 30 days *prior to* the expiration of the *one* [-]year option term." (Ex. 22A ¶ 4 (typed and handwritten portions) (emphasis added).) This handwritten alteration was probably pre-

pared by Wright, Southwest's lawyer. (Vol. I Tr. 77:11–22.)

13. Thereafter, without adopting the changes in the handwritten portion of Exhibit 22A, another draft was prepared. (Ex. 22C (typed portion).)

14. The pertinent portions of this new draft, Exhibit 22C, read: *"This purchase option may not be consummated and closed sooner than twelve (12) months after the closing of this transaction.* . . . The option must be exercised by written notice from [Southwest] to Acme within 30 days of the expiration of the year option term *and the purchase price paid and the transaction completed within fifteen (15) months of the Closing of this original transaction."* (Ex. 22C ¶ 4 (typed portion) (emphasis added).) The underlined portions of this later revision are not directly at issue in this case.

15. At some point, Exhibit 22C was altered again by capitalizing "closing," inserting the phrase "as hereinafter defined" after "closing," striking the word "of" and inserting the word "before," inserting the word "one," and adding commas. The pertinent portions of Exhibit 22C, as altered in handwriting, read as follows: "This purchase option may not be consummated and closed sooner than twelve (12) months after the *C* losing *as hereinafter defined,* of this transaction. . . . The option must be exercised by written notice from [Southwest] to Acme within 30 days *before* the expiration of the *one (1)* [-]year option term, and the purchase price paid and the transaction completed within fifteen (15) months of the Closing of this original transaction." (Ex. 22C ¶ 4 (typed and handwritten portions) (emphasis added).) It is likely that this handwritten alteration was prepared by Gil Lundstrom,[2] another of Acme's lawyers. (Vol. III Tr. 387:22–388:5.) Lundstrom did not deal directly with Wright. (*Id.* Tr. 384:13–25.) Rather, Lundstrom made the changes in another room and Dittrick advised Wright of the changes. (*Id.* Tr. 387:22–388:13.)

16. The language in Exhibit 22C, as modified by the handwritten insertions, was incorporated into a final Letter of Intent that was signed by the parties on August 16, 1993. (Ex. 21 ¶ 4.)

17. The Letter of Intent was ultimately superseded by the Purchase Agreement, signed on August 20, 1993, which altered some of the phrasing of the Letter of Intent but kept the disputed language of the letter, (Ex. 21 ¶ 4), intact. In particular, the purchase agreement, (Ex. 2), continued to use the words of Exhibits 21 and 22C regarding the timing for exercising the option, to wit: "The option must be exercised by written notice from [Southwest] to [Acme] within 30 days before the expiration of the one-year option term." (*Compare* Ex. 22C ¶ 4 *with* Ex. 21 ¶ 4 *with* Ex. 2 ¶ 8.) The drafting of the purchase agreement was a collaborative effort between Wright's firm and Dittrick's firm. (Wright, Dittrick, Dye Trial Test.)

18. Understandably, neither Wright nor Dittrick can remember with particularity what they said to each other regarding the critical words drafted and negotiated on August 16, 1993. (*Compare* Wright Trial Test., particularly Tr. 77:22–78:16; 80:19–81:3; 137:12–25; 168:1–9; 177:21–178:4, *with* Dittrick Trial Test., particularly Tr. 385:4–10; 385:19–21; 409:17–410:24.)

19. The lawyers undoubtedly *thought* various things about these words, but there is no persuasive evidence of what they said to each other regarding their thoughts. For example, Wright testified at one point that "[i]t's the thought that went through my head [but] I don't know that it was ever expressed." (Vol. II Tr. 177:21–178:1.)

20. As negotiations ended on August 16, 1993, Dittrick "paraphrased" the final Letter of Intent to and for the principals of Southwest and Acme and their lawyers. (Vol. III Tr. 416:5–23.) However, as Dittrick recalled at trial regarding the words that have now become so important, "this was not a phrase

---

2. Southwest has asked for recorded rulings on the objections asserted regarding the Lundstrom deposition. In response to this request, I note that those objections are overruled. However, I also add that nothing in the Lundstrom deposition was relied upon by me in reaching my decision in this case. Hence the decision in this case would have been the same regardless of the evidentiary ruling.

that anyone was paying particular attention to." (*Id.* Tr. 417:3–4.)

### Negotiations Regarding Addendum

21. On or about September 1, 1993, the addendum, (Ex. 3), was drafted by Lundstrom for Grady, signed by Grady on behalf of Acme, mailed to Jeff Freeman, amended and signed by Freeman's father on behalf of Southwest, and returned to Grady. Grady then initialed the change. (Vol. II Tr. 191:7–195:6.) There was nothing about the negotiations for the addendum that would shed light on the parties' understanding about precisely when the option had to be exercised. (*Id.*)

22. The amendment established the earliest possible date of closing if the option were exercised; set forth a requirement that a target date for closing be specified if the option were exercised; and established the last possible date of closing if the option were exercised. (Ex. 3.) The amendment did not change the wording regarding when the option was to be exercised. (*Id.*)

### Southwest's Preparations to Exercise Option

23. Southwest obtained a loan commitment in May, 1994, to fund the exercise of the option, but Southwest abandoned the loan commitment prior to Acme's rejection of the purported exercise of the option. (Stark Dep., particularly Tr. 39:21–41:7; Stark Dep. Ex. 1; Vol. II Tr. 210:16–211:13.) While Southwest had "plans" to obtain the money to pay Acme from other sources, Southwest's manager testified that none of the plans were firm. (Vol. II Tr. 209:9–210:8; 214:10–24; Vol. III Tr. 468:6–471:24.) Although Southwest's principals claimed to have strong financial statements, (Ex. 19), the principals were not signatories to the purchase agreement and were not bound by the agreement in the event that Southwest exercised the option. (Ex. 2.) Thus, Acme had no right to expect that the principals would perform Southwest's obligations. Indeed, Southwest's financing "plans" did not focus on its principals, but were limited to the sale of a hotel in Kansas City (which would not have generated enough money to pay Acme), a loan from an outside real estate company, or, as a last resort, a bank loan. (Vol. II Tr. 209:9–210:8; 214:10–24; Vol. III Tr. 468:6–471:24.)

24. According to its books, Southwest's financial condition was bad. (Vol. II. Tr. 266:12–269:17; Vol. III Tr. 321:5–324:2; 333:14–335:11; 498:1–499:7; Exs. 15, 110.)

25. During this period of time, the principals of Southwest and Acme discussed Acme "buying out" Southwest's option, (Exs. 10, 11), but the parties were unable to reach agreement.

26. Southwest notified Acme it was making preparations to exercise the option. (Ex. 12, Letter of 3/23/94.) On July 15, 1994, Southwest's lawyer wrote Acme's lawyer, stating that Jeff Freeman "also wanted me to pass along to you that Southwest ... intends to exercise its repurchase option...." (Ex. 16.)

### Southwest Questions Lawyer About Timing But Rejects Advice

27. Sometime in August, 1994, Mark Lowrey, an accountant employed by Southwest who was present during the negotiations on August 16, 1993, (Vol. I Tr. 69:1–2; 71:6–7), questioned when the option had to be exercised. Jeff Freeman asserted the position now maintained by Southwest, but "Mr. Lowrey ... questioned that somehow." (Vol. II Tr. 254:9–17.) As a consequence, Freeman "called Randy Wright because Mark Lowrey was trying to be a good employee ... and I called Randy and told him to look at it and give me a call back and let me know when exactly I have to exercise that option." (*Id.* 257:1–5.)

28. After considering the matter, Wright wrote Freeman on September 15, 1994, via telefax and first-class mail. (Ex. 134.) Wright's letter stated in pertinent part:

> As I recall our earlier conversation, you thought that the option would need to be exercised prior to 30 days before October 26. I disagree with your reading of the option, but certainly to be on the safe side, you might want us to prepare a notice exercising the option both before and after September 26. Please contact me prior to September 26 concerning whether South-

west Tracor, Inc. wants to exercise the repurchase option.

(*Id.* at 2.)

29. Despite Wright's advice "to be on the safe side" and exercise the option both before and after September 26,[3] Jeff Freeman decided not to follow that advice. (Vol. II Tr. 257:6–258:1.) Freeman testified he feared that by giving two notices "somehow I would end up back in court." (*Id.* 257:23–24.) However, he did not consult Wright about this concern. As Wright testified at trial, "[w]e never had a discussion about their decision." (Vol. II Tr. 155:10–19.)

### Southwest Gives Notice on October 14 and 19

30. Southwest gave notice of its intent to exercise the option on October 14, 1994. (Ex. 4.) This notice did not contain a target date for closing as required by the addendum.

31. Southwest gave amended notice of its intent to exercise the option on October 19, 1994, designating December 15, 1994, as the " 'target date for closing and payment of the purchase price.' " (Ex. 5 (quoting addendum).)

32. The wording of these notices was drafted by Wright. (Vol. II Tr. 152:23–153:5.)

### Acme Rejects Notices But Proposes Escrow of Money/Deed

33. On October 24, 1994, Dittrick wrote Wright that Southwest's "attempt to exercise its option is and was ineffective." (Ex. 17.)

34. Dittrick wrote Wright again on November 7, 1994, noting that a declaratory judgment action would likely soon be filed by Southwest or Acme and stating that "we are agreeable to stipulate to 'expedited' litigation." (Ex. 109 at 2.) Dittrick also stated that he was prepared to discuss the following items:

(1) reserving, without waiver, all of both parties rights, claims, and demands; and

(2) proceeding with the December 15, 1994 Target date for closing; and

(3) establishing an escrow and escrow agreement for (i) the deposit, by [Southwest] of the 2.45 million dollars purchase price, (ii) the 'deed' from [Acme] to [Southwest], (iii) deposits of prorated personal property taxes by the parties, (iv) a deposit of the premium payment of the 'title insurance' policy, (v) assumption and/or assignment of the Lease of the property with [Airport Inn] to the escrow agent, and (vi) deposits of monthly rental payments.

(*Id.*)

35. The escrow proposal was never accepted by Southwest. Jeff Freeman testified that he thought the proposal was impractical. (Vol. III Tr. 328:13–330:10.)

36. On November 8, 1994, Southwest filed suit in federal court in Missouri, (No. 4:CV95–3079, Filing 1, Compl.), which suit was eventually transferred to this court. Acme filed suit in this court on November 14, 1994. (No. 4:CV94–3365, Filing 1, Compl.) The cases were then consolidated for trial.

### Southwest's Actions After Filing Suit

37. Southwest's primary source of hoped-for option financing ended up in litigation with Southwest on an unrelated subject in December, 1994, and the dispute was not resolved until March 1, 1995. (Vol. III Tr. 468:6–470:21.)

38. In November, 1995, Southwest filed an amended tax return for the tax year February 1, 1994, through January 31, 1995, indicating the company had a net operating loss of $5,677,141 and negative taxable income of $3,301,034 during that time. (Jackson Dep., Ex. 135, attached Form 1120, at 1.) This was true despite the fact that Southwest's tax return also reflected forgiveness of debt income in the amount of $3,630,633. (*Id.*, Attach. relating p. 1, l. 10 (other income).)

39. In the fall of 1995, literally during trial of this case,[4] a bank issued a loan com-

---

**3.** September 26, 1994, was eleven months after the original transaction closed on October 26, 1993. Thus, the parties regarded September 26, 1994, as the beginning of the twelfth month. (Vol. I Tr. 5:22–6:13.)

**4.** Due to witness-scheduling problems, Southwest was allowed to take the deposition of a banker during trial, and the record was kept open for that purpose. The deposition, and the

mitment regarding the option. The final commitment, a clarification of a commitment dated October 23, 1995, was issued to a newly formed corporation called "Southwest Tracor of Nebraska, Inc." on November 16, 1995. (Jackson Dep., Ex. 133, Commitment Letter of 11/16/95.) The earlier commitment was issued to Jeff Freeman in October, 1995. (Jackson Dep., Tr. 35:15–21.) No commitment has ever been issued to Southwest, the plaintiff in this case. (*Id.*, Tr. 49:24–50:17.) Among other things, the November commitment was expressly contingent upon one of the principals of Southwest becoming a "comaker." (*Id.*, Ex. 133, Commitment Letter.) Both "Southwest Tracor of Nebraska, Inc." and the principal accepted the loan commitment and agreed to perform its terms and conditions. (*Id.*) It is unclear when this acceptance took place, but it obviously could not have taken place before November 16, 1995, the date of the commitment. Southwest purported to assign its interests to Southwest Tracor of Nebraska, Inc., on November 15, 1995. (*Id.*, Ex. 134, Assignment & Assumption Agreement.) It should be noted, however, that the purchase agreement between Southwest and Acme provides that "[n]either this Agreement, nor any right hereunder, may be assigned by either [Acme] or [Southwest]." (Ex. 2 ¶ 14.)[5]

## II. Law

### Nebraska Law Applies

40. Nebraska law applies to this dispute, and Nebraska, with exceptions not material here, follows *Restatement of the Law of Contracts (Second)* §§ 1–385 (1981). *Lee Sapp Leasing, Inc. v. Catholic Archbishop of Omaha,* 248 Neb. 829, 835–36, 540 N.W.2d 101, 104–105 (1995) (applies *Restatement of the Law of Contracts (Second)* §§ 224, 229 (1981) to analysis of condition precedent); *Whorley v. First Westside Bank,* 240 Neb. 975, 979, 485 N.W.2d 578, 582 (1992) (designates *Restatement of the Law of Contracts (Second)* § 90 (1981), as quoted by another Nebraska case, as "the applicable rule" regarding in-

ducement of action or forbearance); *Spittler v. Nicola,* 239 Neb. 972, 976–78, 479 N.W.2d 803, 807–08 (1992) (quotes *Restatement of the Law of Contracts (Second)* § 88 (1981) regarding requirements for a guaranty, stating that the guaranty in this case was in writing and recited a purported consideration "as required by Restatement (Second) of Contracts § 88 (1981)"); *Rosnick v. Dinsmore,* 235 Neb. 738, 748, 457 N.W.2d 793, 799 (1990) (notes that Nebraska Supreme Court has applied *Restatement of the Law of Contracts (Second)* § 90 (1981) in several cases); *Satellite Dev. Co. v. Bernt,* 229 Neb. 778, 781, 429 N.W.2d 334, 337 (1988) (applies *Restatement of the Law of Contracts (Second)* § 24 (1981) regarding definition of "offer" and determines terms of agreement at issue constituted a valid offer according to that definition); *Chadd v. Midwest Franchise Corp.,* 226 Neb. 502, 508, 412 N.W.2d 453, 458 (1987) (refers to *Restatement of the Law of Contracts (Second)* § 255 (1981) as the "special rule of law [that] applies" in this case); *Shadow Isle, Inc. v. Granada Feeding Co.,* 226 Neb. 325, 329, 411 N.W.2d 331, 334 (1987) (relies on *Restatement of the Law of Contracts (Second)* § 245 (1981) regarding the nonoccurrence of a condition); *Overman v. Brown,* 220 Neb. 788, 791, 372 N.W.2d 102, 105 (1985) (applies *Restatement of the Law of Contracts (Second)* § 60 (1981) regarding acceptance to contract at issue); *Birkel v. Hassebrook Farm Serv., Inc.,* 219 Neb. 286, 289–90, 363 N.W.2d 148, 151–52 (1985) (applies *Restatement of the Law of Contracts (Second)* §§ 347, 351 (1981) regarding damages to analysis of case, specifically stating that court's conclusion is based on a Nebraska case and "in view of the Restatement (Second) of Contracts"); *Leo A. Daly Co. v. Omaha–Douglas Pub. Bldg. Comm'n,* 212 Neb. 533, 541–42, 324 N.W.2d 252, 256–57 (1982) (applies *Restatement of the Law of Contracts (Second)* § 209 (1981) in deciding that two contracts at issue were not an integrated contract).

exhibits it refers to, have now been received by the court, and the record has been closed.

**5.** The agreement contemplated that if Southwest effectively exercised the option and repurchased

the property, it could transfer the property subject to a right of first refusal in Acme. (Ex. 2 ¶ 8A, at 10.) Since the repurchase was never consummated, this provision is not applicable.

## Ambiguity

41. The phrase "within 30 days before" in the purchase agreement, (Ex. 2 ¶ 8), is sufficiently ambiguous as to allow the admission of parole evidence in an effort to understand the meaning of the words, *Restatement of the Law of Contracts (Second)* § 214(c), at 133 (1981), or to supply a reasonable, but missing, term if the agreement does not otherwise fail for lack of mutual assent. *Id.* § 204 cmt. e at 98. The phrase might reasonably be understood to mean that the option had to be exercised during the last 30 days of the one-year option term, and not before. Conversely, the phrase might reasonably be understood to mean that the option had to be exercised before the last 30 days of the one-year option term, and no later. The words used have two equally plausible meanings.

## No Mutual Assent as to Time for Exercise

42. After considering the words of the disputed phrase and the evidence in accordance with appropriate interpretative principles, *id.* §§ 202–203, I find and conclude that both parties reasonably and objectively attached different meanings to the words at the time the terms were agreed to, and neither party knew or had reason to know of the meaning attached to the words by the other party at the time the terms were agreed to. *Id.* § 20(1)(a), at 58 (no mutual assent where "neither party knows or has reason to know the meaning attached by the other"); § 20 cmt. c at 60 ("Even though the parties manifest mutual assent to the same words of agreement, there may be no contract because of a material difference of understanding as to the terms of the exchange."); § 201(3), at 83 ("[N]either party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent."); § 201 cmt. a at 83 ("[M]ost words are commonly used in more than one sense."). Thus, there was no mutual assent as to the time for exercising the option. *Id.*

A. In arriving at this decision, I have applied an objective standard as required by the *Restatement of Contracts (Sec-*

*ond)* and Nebraska law generally. Thus, the subjective intentions or understandings of the parties do not govern the question of whether there was mutual assent. *Id.* § 2 cmt. b at 9 ("Many contract disputes arise because different people attach different meanings to the same words and conduct. The phrase 'manifestation of intention' adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention."). Where, as here, the contract language and the surrounding conduct objectively tested prove that the words used by the parties have two equally plausible meanings, and neither party knew or had reason to know of the meaning attached to the terms by the other party, there is no mutual assent as to those words.

B. That neither party knew or had reason to know of the meaning attached to the terms by the other party is evident from, among other things, the following: (1) the negotiations were conducted primarily between Wright and Dittrick, and, understandably, neither lawyer can remember with particularity what they said to each other regarding the words drafted and negotiated, (pt. I ¶ 18); (2) the final language was the work product of Lundstrom, who did not deal directly with Wright, (pt. I ¶ 15); (3) the lawyers undoubtedly thought various things about the words, but there is no persuasive evidence of what they said to each other regarding their thoughts, (pt. I ¶ 19); (4) as Dittrick recognized at trial, when he "paraphrased" the final Letter of Intent to and for the principals of Southwest and Acme and their lawyers on August 16, 1993, "this was not a phrase that anyone was paying particular attention to," (pt. I ¶ 20); and (5) both Lowrey and Jeff Freeman understood the words differently despite the fact that they represented the same party and were both present at the negotiations, (pt. I ¶¶ 27–28).

## Reasonable Time Supplied

43. Despite this lack of mutual assent as to when the option had to be exercised, since both parties intended that an option to purchase be provided to Southwest and since the terms of the option are otherwise sufficiently definite to be reasonably

enforceable, the agreement as to the option should not fail for lack of mutual assent regarding the time for exercise. *Id.* § 201 cmt. d at 85 ("There may be a binding contract despite the failure to agree as to a term, if the term is not essential or if it can be supplied."); § 204, at 96–97 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."). Rather, the court should impose a time to exercise the option that is reasonable under the circumstances. *Id.*[6] In doing so, "the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process." *Id.* cmt. d at 98.

44. Using this standard, a construction of the agreement providing that notice could only be delivered in the last 30 days of the option term is reasonable. I arrived at this finding and conclusion for the following reasons:

A. Recognizing that the parties intended a "one-year option term," (Ex. 2 ¶ 8), this construction optimizes the time for Southwest to make an intelligent economic decision about whether to exercise the option within the "one-year option term" contemplated by the parties, and is therefore most consistent with the overall structure of the option contemplated by the parties.

B. In this construction, Acme is nevertheless protected from having to close immediately after exercise of the option because the agreement provides that the closing was "to be arranged by the parties," (Ex. 2 ¶ 8), and the purchase agreement and the addendum gave Acme and Southwest a 90–day time frame within which to "arrange" closing after the option was exercised. (Ex. 2 ¶ 8; Ex. 3.)[7]

C. Recognizing that the option was granted as part of the settlement of a bitter dispute, requiring the option to be exercised in the last 30 days would prevent Southwest from exercising the option the day after it was granted and thereby establish a "cooling off" period. This construction is therefore most consistent with the parties' evident intention to cease hostilities.

## Offer to Pay Substitutes for Payment, Presuming Ability to Pay

45. This does not end the matter, however, because Southwest never paid the purchase price. The agreement provided that the "purchase price must be paid or tendered, and [Southwest] must be ready, willing and able to close within fifteen (15) months of the closing of the original sale, and [Acme] is obligated to convey good and marketable title to the Property to [Southwest] ... *within said 15 months, at a closing to be arranged by the parties.*" (Ex. 2 ¶ 8.) An addendum to the purchase agreement also provided that payment was to be made at closing, to wit: "In the event [Southwest] exercises its right to repurchase the property, it must, at the time of exercising said right, also specify a 'target' date for closing and payment of the purchase price...." (Ex. 3.)

46. These provisions created simultaneous duties of performance with regard to payment of the purchase price and delivery of the deed; that is, once the option had been effectively exercised, no later than January 31, 1995, Acme was obligated to convey the premises to Southwest, and Southwest was obligated to pay Acme the purchase price. *Restatement of the Law of Contracts (Second)* § 234 & cmts. (stating preference for simultaneous performance).

47. Insofar as payment of the purchase price by Southwest is concerned, Southwest was permitted to offer, rather than make, payment at the time of the purported exercise of the option and thereafter.

---

6. Because there was, in effect, no agreed-upon time for exercise of the option within the one-year option term, the "time-is-of-the-essence" provision of the agreement, (Ex. 2 ¶ 12), is inapplicable *as to when the option had to be exercised.*

7. I note that the evidence in this case confirms that Acme had a reasonable time to prepare for closing. Southwest's mid-October notice gave Acme approximately two months to prepare between the exercise of the option and the target closing date of December 15, 1994.

*Id.* § 238 & cmt. a at 223 (Where each party has a simultaneous duty, "it is not necessary that he actually perform ... [rather] [i]t is enough that he make an appropriate offer to perform...."). This view is consistent with the addendum to the purchase agreement which provides that payment was to be made at closing, to wit: "In the event [Southwest] exercises its right to repurchase the property, it must, at the time of exercising said right, also specify a 'target' date for closing and payment of the purchase price...." (Ex. 3.) The amended notice of intent to exercise the option, dated October 19, 1994, was an explicit offer of payment; that is, Southwest stated that it "specif[ied] December 15, 1994 as the 'target date for closing and payment of the purchase price.'" (Ex. 5.)

### Lacking Ability to Pay, Southwest's Offer Was Ineffective

48. While the offer to pay could be made in lieu of actual payment of money, Southwest was nevertheless obligated to "offer performance of its part of the simultaneous exchange" while having the "*manifested present ability* to do so." *Restatement of the Law of Contracts (Second)* § 238 (emphasis added). This principle has long been the law in Nebraska. *Oman v. City of Wayne,* 152 Neb. 341, 348, 40 N.W.2d 916, 920 (1950) (In a case involving, among other claims, a suit for specific performance of a real estate contract, the court stated that where acts to be performed by the parties to a contract are mutual and dependent and are to be performed concurrently, the party suing on the contract "'must at least be *able* and willing *to perform at time of performance,* in order to enable him to declare a default on account of nonperformance by the other.'") (quoting *Lang v. Todd,* 148 Neb. 726, 734, 28 N.W.2d 434, 435 (1947) (emphasis added)). *See also Tedco Dev. Corp. v. Overland Hills, Inc.,* 200 Neb. 748, 756, 266 N.W.2d 56, 60–61 (1978) (Specific performance denied when neither on the date of closing nor within a reasonable time thereafter was purchaser able to pay purchase price. The court observed that "[t]he record reveals frenzied activity on the

part of [the buyer] to assemble the necessary funds to enable him to make the purchase.... There is no evidence that [the buyer] ever successfully assembled all the pieces, either on [the date of closing], or within a reasonable time thereafter.... 'A proposed purchaser is not able to perform when he is depending upon third parties to make the purchase, which funds such persons are in no way bound to furnish.'") (quoting 71 Am.Jur.2d *Specific Performance* § 61, at 89); *Sofio v. Glissmann,* 156 Neb. 610, 621–22, 57 N.W.2d 176, 183 (1953) (same rule).

A. Simply put, Southwest had to be able to pay the purchase price at the time it made the offer to pay (when it exercised the option) and thereafter until the last day provided for closing under the contract. *Restatement of the Law of Contracts (Second)* § 238 & cmt. b at 224 (Party offering performance must have the "present ability to make it good."). That this time frame—from the date of the exercise of the option and the concurrent offer to pay until the last date allowed for closing under the contract—is the appropriate time frame, as opposed to some longer period, is evident from the "time-is-of-the-essence" requirement of the purchase agreement. (Ex. 2 ¶ 12.)

B. Otherwise, Southwest's offer of payment was no more than an empty promise that would not trigger any duty on Acme's part to perform its end of the deal. *Restatement of the Law of Contracts (Second)* § 238 & cmt. a at 223 ("[E]ach party is entitled to refuse to proceed with that simultaneous exchange until he is reasonably assured that the other party will perform at the same time.").[8]

49. At no time within the contractual time frame for Southwest's performance of its duty to pay money—not on the date Southwest purported to exercise the option and offered to pay Acme, not on the "target" date for closing set by Southwest, and not on the last possible day for closing, January 31, 1995—did Southwest have the "manifested present ability" to pay Acme the purchase price.

---

**8.** The "fact that [Acme] is ignorant of a defect in [Southwest's] offer is immaterial." *Restatement*

*of the Law of Contracts (Second)* § 238 & cmt. a at 224.

A. Southwest argues that in suits for specific performance, actual performance or tender are not required and a mere "allegation by the plaintiff that he is ready and willing to perform is usually sufficient." *Restatement of the Law of Contracts (Second)* § 363 cmt. b at 182.

B. The short answer to Southwest's assertion is that this argument is irrelevant. Section 363 pertains to *remedies*. That section simply has no relevance to the substantive question of whether Southwest satisfied its contractual obligation to Acme such that it is entitled to any relief, let alone specific performance. In this regard, I remind Southwest that the agreement required it to be "ready, willing and *able* to close within fifteen (15) months." (Ex. 2 ¶ 8 (emphasis added).) Thus, while a showing of "ability" may not always be a requirement for the *remedy* of specific performance, such a showing is obviously necessary when the contract demands it.

50. That Southwest had no "manifested present ability" to pay Acme at any time from the date of exercising the option through January 31, 1995, is evident from the following:

A. Southwest obtained a loan commitment in May, 1994, but according to the loan broker, Southwest abandoned the alleged loan commitment prior to Acme's rejection of the purported exercise of the option. (Stark Dep., particularly Tr. 39:21–41:7). Southwest's manager testified that he quit pursuing this financing because it was going to cost too much and he did not like the way the deal was structured. (Vol. II Tr. 210:16–211:13.) The loan broker was going to charge $31,600 for arranging the financing. (Stark Dep.Ex. 1.) There is no evidence that this fee was ever paid.

B. Moreover, while Southwest had "plans" to obtain the money to pay Acme from other sources, Southwest's manager testified that none of the plans were firmed up at any time from and after the exercise of the option through January, 1995. (Vol. II Tr. 209:9–210:8; 214:10–24; Vol. III Tr. 468:6–471:24.) Southwest's primary source of hoped-for financing ended up in litigation with Southwest on an unrelated subject in December, 1994, and the dispute was not resolved until March 1, 1995. (Vol. III Tr. 468:6–470:21.)

C. According to its financial records, during the period of time Southwest would have been obligated to close, the company was broke, or nearly so. In January, 1994, Southwest had a negative net worth of nearly 2.7 million dollars, and by January, 1995, it had a positive net worth only because a creditor forgave a substantial portion of the company's debt and for accounting and tax purposes, Southwest treated this forgiveness as income, even though it received no cash. (Vol. II Tr. 266:12–269:17; Vol. III Tr. 321:5–324:2; 333:14–335:11; 498:1–499:7; Exs. 15, 110.) For the tax year February 1, 1994, through January 31, 1995, an amended tax return for the company, signed in November, 1995, shows that Southwest had a net operating loss of $5,677,141 for that period of time, and negative taxable income of $3,301,034. (Jackson Dep., Ex. 135, attached Form 1120, at 1.) This was true despite the fact that Southwest's tax return also reflected forgiveness of debt income in the amount of $3,630,-633. (*Id.*, Attach. relating p. 1, 1. 10 (other income).) Southwest's able counsel admitted during oral argument that, according to its books, Southwest was insolvent at the time it would have been required to pay Acme but for the noncash bookkeeping adjustment:

Q. [W]hether but for that adjusting book entry that injected no cash into Southwest Tracor, it is true, . . . as a matter of fact, that Southwest Tracor was insolvent at the time that it would have been required to perform its obligation to Acme in terms of payment of the purchase price?

A. I believe that would be correct, Your Honor.

(Vol. III Tr. 504:22–505:4.)

D. While the principals of Southwest claimed to have substantial net worth, (Ex. 19), the evidence did not establish that Southwest had the manifested ability to perform as a result of these individual financial statements. In fact, Southwest's counsel agreed "in principle" that "we look to the ability of Southwest Tracor to perform, not the ability of who may be the principals of

Southwest...." (Vol. III Tr. 496:14–21.) This was obviously true since Acme could not "compel Mr. Freeman [one of the principals] to pony up 2.4 million bucks" because only Southwest, not its principals, was a signatory to the agreement. (Vol. III Tr. 496:22–25.) Acme could "only compel Southwest Tracor to do that." (*Id.*) Thus, Acme had no right to expect that the principals would perform Southwest's obligations. *Tedco, supra,* 200 Neb. at 756, 266 N.W.2d at 60–61 (" 'A proposed purchaser is not able to perform when he is depending upon third parties to make the purchase, which funds such persons are in no way bound to furnish.' "). This lack of probative value regarding the individual financial statements was made particularly evident by the lack of convincing testimony that any of the financing would come from Southwest's principals. On the contrary, Southwest's financing "plans" did not focus on its principals, but were limited to the sale of a hotel in Kansas City (which would not have generated enough money to pay Acme), a loan from an outside real estate company, or, as a last resort, a bank loan. (Vol. II Tr. 209:9–210:8; 214:10–24; Vol. III Tr. 468:6–471:24.) As a consequence, the net worth of Southwest's principals is not persuasive evidence of a "manifested present ability" to perform *on the part of Southwest* during the relevant time frame.

E. It was not until the time of trial in the fall of 1995 that Southwest had anything approaching a firm financing commitment, and even then the commitment is not probative of *Southwest's* ability to perform during the relevant time frame. (Jackson Dep., Continued Dep. of 11/21/95, 11/30/95.) As a matter of fact, the November, 1995, commitment was issued not to Southwest, but to a newly formed corporation called "Southwest Tracor of Nebraska." (Jackson Dep., Ex. 133, Commitment Letter of 11/16/95.) And the commitment required a principal to be a "co-maker." These two facts—issuance to another corporation and the requirement of a comaker—establish that *Southwest* simply did not have the ability to perform under the

contract. Moreover, even had *Southwest* obtained financing in November, 1995, the company would still have been in default. The purchase agreement and addendum required that Southwest be "able" to perform between the time of the exercise of the option and January 31, 1995, (Ex. 2 ¶ 8; Ex. 3), and "time [was] of the essence." (Ex. 2 ¶ 12.)

### Southwest's Inability to Pay Was First Material Breach

51. Acme's action in declaring the exercise of the option untimely and refusing to convey the premises to Southwest did not excuse the deficiency in Southwest's offer of payment. This is true because Southwest's material[9] failure of performance came first as a matter of fact; that is, there was a material failure of performance on the part of Southwest from the moment it exercised the option and made the offer of payment, which material failure preceded any action on Acme's part. *Restatement of the Law of Contracts (Second)* § 237 cmt. b at 217–18 (The "[f]irst material failure of performance" excuses the other party's duty to perform, and if not timely cured, discharges the duty to perform altogether.). It must be remembered that the offer of payment was only effective *if* Southwest had the "manifested present ability" to pay. *Id.* § 238. Because the inability to pay came first as a matter of fact, extended throughout the time Southwest had to perform under the agreement, and was critical (material) to the ultimate transaction, Acme's later action in declaring Southwest's actions untimely did not excuse Southwest's earlier deficient performance. *Id.* § 237.

### Acme's Actions Did Not Cause Southwest's Inability to Pay

52. Even if I assume, for purposes of this decision only, that Acme's action in refusing to accept the exercise of the option as timely may be construed as either a breach, *id.* § 245, at 258, or as repudiation of the agreement, *id.* § 255, at 291, despite the fact that

---

9. Southwest's deficient performance was obviously "material"; that is, from Acme's perspective the ability to pay and payment of the purchase price were central to the deal. *Restate-*

*ment of the Law of Contracts (Second)* § 241, at 237 (setting forth criteria for determining whether a failure is material).

Acme's action took place *after* Southwest's deficient offer of payment, Acme's breach or repudiation does not excuse Southwest's lack of performance. This result follows because Acme's actions did not "materially" contribute to Southwest's "manifested present *in*ability" to pay Acme the purchase price, and thus Southwest's duty to possess the "manifested present ability" to pay was not excused. *Id.* §§ 245, 255 (requiring that breach or repudiation "contribute materially to the non-occurrence of a condition" before nonoccurrence of the condition is excused). In the words of the Restatement, Acme's alleged breach or alleged repudiation "must contribute materially to the non-occurrence of the condition, and if the condition would not have occurred in any event, its non-occurrence is not excused. In such a case both parties are discharged." *Id.* § 255 cmt. a at 292.

53. Acme's presumed breach or repudiation did not materially contribute to Southwest's lack of a "manifested present ability" to pay. Southwest never had and never would have had the ability to close the transaction within the time frame set forth in the agreement even if Acme had not rejected the exercise of the option. This is true because:

A. Southwest claimed to have been negotiating a loan commitment in May, 1994, but according to the loan broker, Southwest abandoned the alleged loan commitment *prior* to Acme's rejection of the purported exercise of the option. This in turn suggests that Acme's *later* action did not materially contribute to any financing difficulty on the part of Southwest.

B. Between September, 1994, and January, 1995, Southwest had no loan commitments to fund the option price, and Southwest's financial records indicate the company was essentially broke. When warned by its lawyer to exercise the option both before and after the critical date so as to avoid any misunderstanding, Southwest disregarded

that advice and waited until after the disputed date to exercise its option. (Ex. 134 ("[C]ertainly to be on the safe side, you might want us to prepare a notice exercising the option both before and after September 26."); Vol. II Tr. 154:21–155:11; 253:14–258:1; Vol. III Tr. 466:1–468:5.) These two facts—inability to pay and disregard of a warning to exercise sooner—strongly suggest that Southwest was stalling by creating a dispute in hopes that litigation might provide it additional time, beyond the contract deadline, in which to find financing.

C. On November 7, 1994, (Ex. 109), well before the target closing date of December 15, 1994, set by Southwest, (Ex. 5), and also well before the January 31, 1995, contract deadline for closing, (Ex. 3), Acme offered to escrow a deed in exchange for the escrow of the purchase price with a commitment to seek a quick judicial resolution of the dispute. Southwest did not accept this solution, and its manager's explanation that Acme's offer was impractical is not persuasive. (Vol. III Tr. 328:13–330:10.) If it was practical to close on December 15, 1994, by exchanging a deed for the money, as Southwest obviously contemplated, then Acme's escrow proposal was equally practical. If the closing did not take place within the time contemplated by the contract (or thereafter), both parties (including Southwest's lender) could be returned to the status quo without harm. Southwest's inaction in this regard suggests that Southwest could not perform during the contract time frame regardless of Acme's position and that Southwest was seeking additional time beyond the contract period to secure financing.

D. As noted earlier, Southwest is even now unable to obtain a loan commitment; the commitment it possesses is extended to another corporation.[10] This further establishes that nothing Acme did contributed to *Southwest's* continued inability to pay.

---

10. The decision to extend the loan commitment to another corporation rather than to Southwest and the requirement that the loan also have a "co-maker" may have been influenced by the November 3, 1995, amended tax return filed by Southwest, a copy of which was in the possession of the banker. (Jackson Dep., Ex. 135, attached

Form 1120, at 1.) Given the distressing financial condition reflected on the amended return of November 3, 1995, it is not surprising that on November 16, 1995, the banker issued the loan commitment to another corporation and required a "co-maker."

### Loss of Option as a Result of Inability to Pay Not a Forfeiture

54. Southwest makes a number of arguments attempting to avoid the loss of the option because of its inability to pay. Among those arguments is one which asserts that the court should not find in favor of Acme because such a finding amounts to a "forfeiture." In essence, Southwest argues that it sold the hotel to Acme for 2.65 million dollars, and received the opportunity to repurchase the hotel via the option for 2.45 million dollars. Thus, so the argument goes, if Southwest is not allowed to realize upon its option, the court will have imposed an unfounded "forfeiture" upon Southwest because it loses the opportunity to repurchase the hotel for less than Acme paid. I reject this argument.

55. Southwest's forfeiture argument fails for two reasons:

A. First, setting aside the question of whether the court's action works a "forfeiture," the court has only required that Southwest live up to its end of the deal. Southwest explicitly promised that it would be "ready, willing and *able* to close within fifteen (15) months." (Ex. 2 ¶ 8 (emphasis added).) Thus, even if the court's action works a "forfeiture," it is a justifiable forfeiture resulting from enforcement of the explicit terms of the option:

> Despite equity's dislike of forfeitures, requirements governing the time [11] and manner of exercise of a power of acceptance under an option contract are applied strictly. It is reasoned that any relaxation of terms would substantively extend the option contract to subject one party to greater obligations than he bargained for.

*Restatement of the Law of Contracts (Second)* § 25 cmt. d, reporter's note at 75 (citations omitted).

B. Second, the court's ruling does not work a "forfeiture" if by the word "forfeiture" Southwest means the court has imposed a "penalty." *See, e.g., Black's Law Dictionary* 650 (6th ed. 1990) (to "forfeit" is "[t]o incur a penalty"). After all, Acme paid Southwest $200,000 *more* than the option price. Thus, the court's ruling requires Southwest to forgo the right to impose a $200,000 *loss* on Acme. It is simply not accurate to characterize such a result as a "penalty" or "forfeiture."

### III. Summary

Southwest tried to exercise an option without having the ability to pay the option price in violation of the express provisions of the agreement between the parties and the applicable law. Therefore, Southwest loses.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document providing that "judgment is entered for Acme Investment, Inc., and against Southwest Tracor, Inc., providing that Southwest Tracor, Inc., shall take nothing and its complaint is dismissed; judgment is further entered in favor of Acme Investment, Inc., and against Southwest Tracor, Inc., providing that Southwest's option rights under paragraph 8 of the Purchase Agreement have expired and are terminated."

---

11. This strict approach does not apply to the option-exercise timing question because there was no mutual assent (no agreement) on that issue and thus no time to strictly enforce. In contrast, this strict approach is appropriate regarding the question of "ability" because there is no doubt that Southwest promised to be "able" to perform within the undisputed time for closing set forth in the agreement.