—————————

No. 96-1286
—————————

Acme Investment, Inc., a                    *
Nebraska corporation,                       *
                                            *
            Appellee,                       *
                                            *  Appeal from the United States
       v.                                   *  District Court for the
                                            *  District of Nebraska.
Southwest Tracor, Inc., a                   *
Texas corporation,                          *
                                            *
            Appellant.                      *

—————————

            Submitted:  November 12, 1996

               Filed:  January 28, 1997
—————————

Before FAGG, BEAM, and HANSEN, Circuit Judges.
—————————

BEAM, Circuit Judge.


      Southwest Tracor, Inc. (Southwest) appeals the district court's[1]
judgment in favor of Acme Investment, Inc. (Acme) in this diversity action
for specific performance of a real estate purchase agreement.  We affirm.


I.    BACKGROUND


      This lawsuit concerns a Best Western hotel located near the Lincoln,
Nebraska, airport.  In May of 1986 appellant Southwest, which then owned
the hotel, entered into a lease with Airport Inn, Inc.  Airport Inn
operated the hotel under the lease for several

———————————————

[1]The Honorable Richard G. Kopf, United States District Judge
for the District of Nebraska.

years, but in 1992 various disputes arose between Southwest and Airport Inn. As a result of these disputes, Southwest attempted to terminate the lease. Claiming that Southwest's termination was invalid under the lease, Airport Inn refused to vacate the property. Southwest then brought an ejectment action in Nebraska court. Shortly thereafter, Airport Inn filed for bankruptcy.

Shortly before Southwest's ejectment action reached trial, the parties reached a settlement. Under the settlement, Southwest sold the hotel to appellee Acme, another corporation owned by Airport Inn's parent company, for $2.65 million. The parties closed on October 26, 1993, and Acme acquired ownership.

As part of the settlement, the parties agreed that Southwest would retain an option to repurchase the hotel from Acme. The purchase agreement stated that:

> Any such repurchase shall be for a price of $2,450,000.00 cash at closing. The option must be exercised by written notice from [Southwest] to [Acme] within 30 days before the expiration of the one-year option term.

The option period was to end one year from the closing of Acme's purchase of the hotel from Southwest, that is, October 26, 1994. An amendment to the settlement's purchase agreement required that should Southwest exercise its option to repurchase the hotel, it had to set a date for closing between November 1, 1994, and January 31, 1995.

On October 14, during the final thirty days of the one-year option period, Southwest notified Acme that it was exercising its option. By notice to Acme on October 19, Southwest chose December 15, 1994, as the target date for closing. Acme, however, refused to honor the option, claiming that the contract required exercise of the option before the last 30 days of the option year and that the purported exercise was therefore untimely. Acme offered

-2-

instead to proceed to closing on December 15, placing the purchase price and title in escrow pending judicial resolution of the dispute.

Southwest did not accept Acme's escrow proposal, and Acme filed a declaratory judgment action in federal district court in Nebraska, seeking a declaration that Southwest's option had lapsed. Southwest filed an action for specific performance in federal court in Missouri. The actions were consolidated and proceeded to a bench trial in Nebraska. The district court found that Southwest's exercise of the option was timely, and Acme has not appealed that finding. The district court also found, however, that Southwest was not ready, willing, and able to perform by tendering the $2.45 million purchase price, either at the time of the exercise of the option or at any time during the three-month window for closing the transaction. Acme Inv., Inc. v. Southwest Tracor, Inc., 911 F. Supp. 1261, 1275 (D. Neb. 1995). On this basis, the district court entered judgment for Acme. Southwest appeals.

**II. DISCUSSION**

The parties agree that Nebraska law applies to the substantive legal issues presented by this appeal. Nebraska appellate courts review specific performance actions de novo in regard to both law and facts. III Lounge, Inc. v. Gaines, 348 N.W.2d 903, 905 (Neb. 1984). In our view, the Nebraska court's de novo standard is an issue of substantive, rather than procedural state law, comparable to the standard for reviewing the sufficiency of evidence to support a jury verdict. See Burke v. Deere & Co., 6 F.3d 497, 511 (8th Cir. 1993) (in diversity actions, state law determines standard of review for sufficiency of the evidence). We therefore apply state law and review the district court's judgment de novo. Erie R.R. v. Thompkins, 304 U.S. 64, 78 (1938).

Noting that Nebraska courts have often followed the Restatement (Second) of Contracts, the district court grounded its analysis on section 238 of the Restatement.  Section 238 provides:

> Where all or part of the performances to be exchanged under an exchange of promises are due simultaneously, it is a condition of each party's duties to render such performance that the other party either render or, with manifested present ability to do so, offer performance of his part of the simultaneous exchange.

Restatement (Second) of Contracts § 238 (1979).  The district court reasoned that in order to bind Acme, Southwest had a simultaneous duty of performance:  it had to either tender the purchase price or show that it was ready, willing, and able to tender at the time it exercised the option. The district court held that Southwest's failure to either tender or to manifest the ability to tender placed Southwest in breach of the contract, and thus this failure did "not trigger any duty on Acme's part to perform its end of the deal."  911 F. Supp. at 1271.

Southwest makes two main objections to the district court's analysis. First, it claims that the district court erred in ruling that Southwest had a duty to tender $2.45 million at the same time it exercised the option. Rather, the parties' contract specified that the repurchase would be consummated by "cash at closing."  According to Southwest, this meant that it had no duty to perform under the contract until closing.  Second, Southwest argues, any duty on its part to perform was discharged when Acme told Southwest it considered the option untimely exercised and would not honor it.  Therefore, Southwest argues, when Acme repudiated the deal Southwest had no further duty to seek financing for the purchase, and, accordingly, had no burden to show that it had the ability to pay at the time it exercised the option.

To a certain point, we agree with Southwest. Under Nebraska law, an option holder has no duty to tender performance upon exercising the option unless the contract creating the option so provides. III Lounge, 348 N.W.2d at 906 (citing J.R. Kemper, Annotation, Necessity for Payment or Tender of Purchase Money Within Option Period, 71 A.L.R.3d 1201, 1205-06 (1976)); Gleeson v. Frahm, 320 N.W.2d 95, 97 (Neb. 1982). The Southwest-Acme contract provided that Southwest could repurchase the hotel upon its option "for a price of $2,450,000.00 cash at closing." (emphasis added). The parties agreed that Southwest could, upon exercising the option, set a closing date for any time between November 1, 1994, and January 31, 1995. The contract clearly did not require Southwest to perform its contractual obligation (that is, tender the purchase price) until closing. Because its time of performance had not arisen when Acme repudiated the option, Southwest could not have breached.

Furthermore, Southwest correctly argues that Acme's actions discharged it of any further duty to perform under the contract. "[A]n unqualified renunciation of an executory contract before time for performance by one party excuses tender of performance by the other party at the time set for performance." In re Estate of Michels, 389 N.W.2d 285, 289 (Neb. 1986) (citations omitted). We disagree with Acme that its offer to place title and the purchase price in escrow pending litigation satisfied its contractual duties. Acme's unambiguous position that it did not consider Southwest's exercise of the option valid was clearly an "unqualified renunciation" of the contract. Upon Acme's repudiation, Southwest was discharged of any duty of performance, and could sue immediately for Acme's breach. Restatement (Second) of Contracts, § 253.[2]

_____

[2]Section 253 provides:

Effect of a Repudiation as a Breach and on Other Party's Duties

(1) Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

This does not settle the issue, however, because the district court specifically found that Southwest would have been unable to perform not only at the time it exercised the option, but at all times thereafter during the three-month period for closing. 911 F. Supp. at 1271. Although the district court incorrectly characterized this as a breach by Southwest, such a finding necessarily precludes any remedy for Southwest. "`The failure or inability or refusal to carry out the terms of the contract <u>at the time when performance is due</u> will ordinarily be grounds for refusing specific performance . . . .'" <u>Tedco Dev. Corp. v. Overland Hills, Inc.</u>, 266 N.W.2d 56, 60 (Neb. 1978) (quoting 71 Am.Jur.2d <u>Specific Performance</u> § 60, at 88 (1973)) (emphasis in original); <u>see also</u> <u>Sofio v. Glissmann</u>, 57 N.W.2d 176, 183 (Neb. 1953). Although the parties here vigorously debate how to properly apply the Restatement (Second) of Contracts, neither side addresses the most relevant provision. Section 254(1) provides:

> A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise.

Comment (a) to section 254 states:

> *Non-performance by injured party after repudiation.* If the parties are to exchange performances under an exchange of promises, each party's duties to render performance are generally regarded as conditional on the other party's performance, or at least on his readiness

---

(2) Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.

-6-

to perform (§§ 237, 238, 251, 253). <u>This principle applies even though one party is already in breach by repudiation.</u> His duty to pay damages is discharged if it subsequently appears that there would have been a total failure of performance by the injured party. . . . The result follows even if it appears that the failure [by the injured party] would have been justified and not a breach.

(emphasis added). As section 254 makes clear, while an anticipatory repudiation releases the nonbreaching party of any duty to perform, repudiation does not relieve the nonbreaching party of showing its ability to perform in order to obtain a remedy. <u>See also</u> <u>Gibbs, Nathaniel (Canada) Ltd. v. International Multifoods Corp.</u>, 804 F.2d 450, 452 (8th Cir. 1986) (Section 254 bars remedy for anticipatory repudiation when nonbreaching party could not have performed); <u>Record Club of America, Inc. v. United Artists Records, Inc.</u>, 890 F.2d 1264, 1275 (2d Cir. 1989) (same); 5 Williston on Contracts § 699, at 352-53 (3d ed. 1961); 4 Corbin on Contracts § 978, at 924-25 (1951). To obtain a remedy, Southwest had to show that it would have been able to tender $2.45 million at closing. This is true even though Acme, not Southwest, was in breach and Southwest had no obligation to proceed to closing. Furthermore, the district court properly placed on Southwest the burden to prove that it would have been able to perform when that performance came due. <u>Panhandle Rehabilitation Ctr., Inc. v. Larson</u>, 288 N.W.2d 743, 746 (Neb. 1980); <u>Tedco</u>, 266 N.W.2d at 60-61; 5 Williston § 699, at 353.

Our de novo review of the record convinces us that Southwest failed to prove its ability to perform. Southwest's general manager, Jeffrey Freeman, testified that Southwest had made some preliminary financing plans, including obtaining a loan commitment from a Colorado loan broker, First United Financial Corporation. However, Freeman testified that by the time Southwest attempted to exercise its option, he "didn't like the way . . . the deal was structured," Tr. at 211, with First United and thought that there

were "better opportunities" for financing. Tr. at 210. Furthermore, First United's president testified that First United had a corporate existence of only six to eight months, was never capitalized in excess of $10,000, brokered no real estate loans during its existence, and never obtained any written commitments from potential lenders regarding Southwest's purchase of the Lincoln hotel.

Jeffrey Freeman also testified that Gencom Acquisition Corp., the buyer of a Kansas City hotel owned by Southwest's principals, was interested in partially financing the Lincoln hotel purchase. Southwest, however, introduced no evidence that Gencom's "interest" proceeded beyond mere discussion. Furthermore, Gencom brought suit against Southwest for specific performance of the Kansas City transaction in December of 1994, during the closing period for the Southwest-Acme repurchase contract.

Freeman also testified that "if push came to shove," Southwest would have been able to secure a loan from Stanley Bank, a Kansas bank with which Southwest had done business. Tr. at 210. Yet Southwest never actually approached Stanley Bank for financing, and Freeman testified that Southwest had primarily used Stanley Bank as a line of credit for operational expenses and "not so much [as] a huge lender of big real estate transactions." Tr. at 244. Another company owned by Southwest's principals, Southwest Tracor of Nebraska, ultimately did obtain a loan commitment from Stanley Bank for purchase of the Lincoln hotel. This commitment did not come, however, until October of 1995. There is no evidence that Stanley Bank did or would have extended such a loan to Southwest Tracor during the three-month closing period between November 1, 1994 and January 31, 1995.

To prevail in this action, Southwest had, of course, no obligation to continue seeking financing or to actually obtain financing after Acme breached. Nevertheless, Southwest must still

prove that it could by some means have tendered to Acme $2.45 million by January 31, 1995. In light of further evidence that Southwest was either insolvent or nearly so during this period, Southwest's evidence of its ability to close is not persuasive. Finally, we note that the district court properly declined to consider the financial resources of Southwest's principals and their other businesses. "`A proposed purchaser is not able to perform when he is depending upon third parties to make the purchase, which funds such persons are in no way bound to furnish.'" Tedco, 266 N.W.2d at 61 (quoting 71 Am.Jur.2d Specific Performance § 61, at 89); Sofio, 57 N.W.2d at 183. Southwest did not prove its ability to tender the purchase price if it had gone to closing, and is not entitled to specific performance despite Acme's breach of the contract.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.